William H. GEISDORF, an individual, and Valline Gallery Framing, Inc., a Utah corporation, dba The Family Jewels/White Wolf Gallery, Plaintiffs, Appellees, and Cross–Appellants,

v.

Mary DOUGHTY, an individual, The Family Jewels, Inc., a Utah corporation, and Doughty/Schwertfeger Enterprises, L.C., a Utah Limited Liability Company, Defendants, Appellants, and Cross–Appellees.

No. 970181.

Supreme Court of Utah.

June 19, 1998.

Rehearing Denied Oct. 29, 1998.

Joseph E. Tesch, Tracey Paul, David B. Thompson, Park City, for plaintiffs.

David M. Eckersley, Salt Lake City, and Janet A. Goldstein, Park City, for defendants.

HOWE, Chief Justice:

Defendant Mary Doughty appeals from a judgment entered against her and in favor of plaintiff William H. Geisdorf stemming from a dispute over a lease agreement between the parties. Doughty contends the trial court erroneously stated the law in the jury instructions. She seeks (1) reversal of the judgment entered below on the jury verdict and (2) a new trial to address her counterclaim. Geisdorf cross-appeals, seeking a remand to the trial court for clarification and resolution of his claim against Doughty for an alleged breach of contract.

## BACKGROUND

In August of 1992, William Geisdorf and Mary Doughty negotiated for the sale of her jewelry business, known as "The Family Jewels," and for the lease of a portion of her building located at 591 Main Street in Park City, Utah, where Geisdorf intended to continue to operate that business. Both the Purchase Agreement and the Lease Agreement between the parties took effect on September 1, 1992.

The Lease Agreement provided for a basic term of three years, to expire on August 31, 1995, and for two options to renew for two additional terms of five years each. This "Options of Renewal" clause [hereafter "the Renewal Clause"] is the source of the parties' disagreement. The Renewal Clause reads, in pertinent part:

> Lessee shall have two options to renew this lease for a period of five additional years each. Written notice of intention to renew must be furnished Lessor at least four (4) months prior to expiration of the lease or any renewal hereunder and this lease must not then be in default or have been routinely in default during the prior term.

For the majority of the basic term, the parties had a good, cordial business relationship. Difficulties were minor and generally were handled through "informal" meetings. In January 1995, Doughty visited Geisdorf in one of these "informal" meetings and offered him a tentative payment plan for the coming year. This plan included a rent payment schedule for those payments that would come due if Geisdorf chose to renew the lease. The April 30 deadline for exercising the option passed; Doughty received no written notice of Geisdorf's intention to renew. Sometime in early July, Doughty met with the manager of The Family Jewels to discuss plans to paint the building at the end of July, including a proposal that Geisdorf would be responsible for paying a portion of the painting costs. Soon thereafter the tenor of the parties' business relationship changed.

On July 15, 1995, Doughty, having not received the written notice required by the Lease Agreement concerning exercise of the option, sent a letter to Geisdorf. This letter read:

> It has been brought to my attention that we have not received notice of your intentions regarding renewal of the rental space located at 591 Main Street. The terms of the present lease will expire on August 31, 1995. Your option to renew the present lease has expired (Section 14 [of the Lease Agreement]). If you wish to remain in the space we will need to renegotiate as soon as possible.

Doughty made a handwritten note at the bottom of the letter requesting a prompt response. Geisdorf answered with a letter dated July 24, 1995, which read in pertinent part, "This is in response to your letter regarding renewal of the lease on 'The Family Jewels.' ... Please use this as a confirmation of my verbal intention to renew the lease as per the original agreement."

As the time for exercising the option had elapsed nearly two months earlier, Doughty initiated negotiations with Geisdorf for a new lease. These negotiations soon proved fruitless as Geisdorf steadfastly maintained his right as lessee to remain in the building. In August 1995, Geisdorf filed this action claiming that "under the circumstances, he had exercised his option to renew the lease" and

was therefore legally entitled to remain on the premises as lessee under the first five-year renewal term.

Doughty responded by serving Geisdorf with a notice to quit as provided for in section 17 of the Lease Agreement, which reads in pertinent part:

*HOLDING OVER:* If Lessee holds possession of the premises after the term of this lease, Lessee shall become a tenant from month-to-month on the terms herein specified ... and Lessee shall continue to be a month-to-month tenant *until the tenancy shall be terminated by Lessor,* or until Lessee has given to Lessor a written notice ... of his intention to terminate the tenancy.

(Emphasis added.) Doughty also closed the bank account to which Geisdorf had been making rent payments.

Geisdorf remained obdurate in the face of the notice to quit and subsequent proceedings to evict him from the premises. In October, November, and December of 1995, he deposited rent payments to Doughty's closed bank account, which the bank mistakenly accepted but later returned to Geisdorf. Two of the deposits were returned along with a letter dated December 5, 1995, explaining, in part, that the deposits had been "erroneously accepted" for an account "closed by the customer on September 28, 1995" and requesting that no further deposits be made.

In February 1996, Geisdorf complained of a water leak in the ceiling of the store that had damaged ceiling tiles, walls, and merchandise. Geisdorf requested that Doughty take care of it based on section 7 of the Lease Agreement that stipulated: "Lessor shall be responsible for all structural repairs and repairs or replacement of the roof." Doughty had the ice build-up removed from the roof, but would not repair any interior damage, since "[she] didn't feel it was her responsibility ... [b]ecause Mr. Geisdorf had already been served with a notice of eviction, and he was [remaining] there unlawfully."

In April of 1996, Doughty filed a counterclaim against Geisdorf for unlawful detainer. The case went to trial and a jury returned findings in favor of Geisdorf. In harmony with the jury's findings, the court adjudged that Geisdorf was to "remain in the leased premises during the first option period, September 1, 1995, through August 31, 2000, pursuant to the Lease Agreement." Additionally, pursuant to the jury's finding that Doughty had breached the Lease Agreement, the court awarded Geisdorf $2,905 in damages. Doughty now appeals and requests that we reverse the trial court's judgment for Geisdorf and remand this case for further proceedings to grant her relief on her counterclaim. She contends that the trial court erroneously instructed the jury that "substantial compliance" with the renewal option is sufficient to constitute an exercise thereof. Furthermore, she maintains that at no time did her conduct meet the requirements necessary for waiver and that the jury's finding of waiver by her was not supported by the evidence. Geisdorf cross-appeals, contending that the trial court did not adequately address an alleged breach of the Lease Agreement. At trial, Geisdorf requested that the court require the jury to specifically determine whether Doughty's "failure to replace the north facing building sign [was] a breach of the agreement." The court declined, electing instead to ask the jury whether "Doughty breached any term of the lease agreement" and "what damage, if any, was caused by such breach." He now asserts error in the trial court's instructions, claiming ambiguity regarding his asserted breach and the damages arising therefrom. He requests a remand for clarification on this issue.

## DISCUSSION

The court instructed the jury, in part, to decide whether (1) "Geisdorf substantially complied with the lease's notice of renewal provision"; (2) "Doughty distinctly manifested an intent to waive her right to receive written notice"; and (3) "Geisdorf relied upon any distinct waiver ... when he failed to give written notice of his exercise of his option." The jury found for Geisdorf in each instance. The issue of whether substantial compliance with the renewal clause is sufficient to constitute an exercise thereof is a question of law which this court reviews for

correctness, *see United Park City Mines Co. v. Greater Park City Co.,* 870 P.2d 880, 885 (Utah 1993), and to which this court gives no deference. *See Zoll & Branch, P.C. v. Asay,* 932 P.2d 592, 593 (Utah 1997); *State v. Anderson,* 929 P.2d 1107, 1108 (Utah 1996). The issue of waiver is a question of fact; when examining jury verdicts such as these, "we 'review the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict,' " *State v. Alvarez,* 872 P.2d 450, 459 (Utah 1994) (quoting *State v. Hamilton,* 827 P.2d 232, 236 (Utah 1992)), and reverse the lower court only when "we conclude that the evidence is insufficient to support the verdict." *Scudder v. Kennecott Copper Corp.,* 886 P.2d 48, 52 (Utah 1994).

## I. SUBSTANTIAL COMPLIANCE

The initial question we address is one of "substantial" compliance versus "strict" compliance. Specifically, we must decide whether it was error for the trial court to instruct the jury that Geisdorf was only required to substantially comply with the Renewal Clause. We look first to the pertinent language of that clause which provides: "Lessee shall have two options to renew this lease for a period of five additional years each. *Written notice* of intention to renew must be furnished Lessor *at least four (4) months* prior to expiration of the lease. . . ." (Emphasis added.)

This court has previously held that " '[w]hen the optionee decides to exercise his option he must act unconditionally and precisely according to the terms of the option.' " *Upland Indus. Corp. v. Pacific Gamble Robinson Co.,* 684 P.2d 638, 640 (Utah 1984) (quoting *Williston on Contracts* § 61D (3d ed.1957)). Actual exercise of the option must be "in accordance with its terms." *J.R. Stone Co. v. Keate,* 576 P.2d 1285, 1288 (Utah 1978); *see also Nance v. Schoonover,* 521 P.2d 896, 897 (Utah 1974); *Equitable Realty, Inc. v. Nielson,* 30 Utah 2d 433, 435, 519 P.2d

243, 244 (1974) (stating that an option, once granted, "must be exercised strictly according to its terms").[1]

■ Courts across the country also follow this rule of law. The exercise of an option requires the affirmative performance of an option according to its specific terms. *See Loose v. Brubacher,* 219 Kan. 727, 549 P.2d 991, 996 (1976); *Northcutt v. McPherson,* 81 N.M. 743, 473 P.2d 357, 359 (1970); *State ex rel. Carriger v. Campbell Food Markets, Inc.,* 65 Wash.2d 600, 398 P.2d 1016, 1021–22 (1965). An optionee is to be held to strict, exact compliance with the provisions and restrictions of an option. *Richardson v. Casey,* 6 Ariz.App. 141, 430 P.2d 720, 722 (1967); *Rosenthal v. Sandusky,* 35 Colo.App. 220, 533 P.2d 523, 526 (1975); *Covey v. Covey's Little America, Inc.,* 378 P.2d 506, 513 (Wyo. 1963). Such strict compliance is necessary before the option becomes "absolute and binding," *Anderson v. Overland Park Credit Union,* 231 Kan. 97, 643 P.2d 120, 125 (1982), "a bilateral contract," *Maloff v. B–Neva, Inc.,* 85 Nev. 471, 456 P.2d 438, 439 (1969), and "an executory contract." *Cillessen v. Kona Co.,* 73 N.M. 297, 387 P.2d 867, 870 (1964).

■ Furthermore, "the doctrine of substantial performance cannot be used to avoid mandatory [option] provisions." *Stratman v. Dietrich,* 765 P.2d 603, 605 (Colo.Ct.App. 1988). As one court has correctly stated:

> The rule of substantial compliance with the terms of the contract which is applicable to bilateral contracts whereby both parties are already bound *is not applicable to the exercise of an option,* which . . . is a continuing offer to make a bilateral contract [and] must be accepted precisely according to the terms of the offer.

*Jones v. Horner,* 36 Tenn.App. 657, 260 S.W.2d 198, 199 (1953) (emphasis added) (citations omitted). In other words, although substantial compliance is sufficient for bilat-

---

1. A decision by the Utah Court of Appeals, while not binding on this court, also supports the general rule that "[o]ption agreements become bilateral contracts . . . only upon exercise of the option in accordance with its terms." *Mills v. Brody,* 929 P.2d 360, 364 n. 1 (Utah Ct.App.

1996); *see also Equitable Life & Cas. Ins. Co. v. Ross,* 849 P.2d 1187, 1192 (Utah Ct.App.1993) ("When an offer specifies the manner in which it must be accepted, it can only be accepted in the specified manner. Otherwise mutual assent is lacking, and no contract is formed.").

eral contracts, performance of an option requires strict compliance.

Strict compliance is not arcane ritualism at work, or as Geisdorf suggests, "hocus-pocus." On the contrary, there is no "unnecessarily mysterious or elaborate activity or talk to cover up a deception"[2] which Geisdorf seems to imply. Insisting upon parties' compliance with contractual language may seem to some to be rigorously punctilious. However, this is not necessarily the case.

Indeed, there are instances in which deviation from strict compliance may be equitably excused. *See Nielson v. Droubay,* 652 P.2d 1293, 1297 (Utah 1982) (holding that strict compliance is excused when substantial compliance is offered to and accepted by optionor under "exigent circumstances beyond [the parties'] control"). Some instances in which an optionee may be excused from strict compliance include when the optionee's "conduct in failing to comply was not due to willful or gross negligence on the part of the optionee but was rather the result of an honest and justifiable mistake," *Cattle Feeders, Inc. v. Jordan,* 549 S.W.2d 29, 33 (Tex. Civ.App.1977), and in cases "where the strict compliance was prevented by some act of the optionor such as waiver or misleading representations or conduct." *Id.* Barring such instances, however,

> [i]t is as much incumbent upon an optionee to comply with the terms of his option as upon a direct contractee in an agreement of sale to comply with the terms of his agreement. Accordingly, where parties enter into a contract by the terms of which one of them binds himself to perform at the option of the other, upon being given written notice, *the party having such option must exercise it in the manner provided by the contract.*

17A Am.Jur.2d *Contracts* § 73 (1991) (emphasis added). In the absence of some such supervening, excusing instance, this court has no choice but to require strict compliance with the terms of the Lease Agreement. This being so, unless Doughty waived her right to receive written notice, we must require strict compliance with the Renewal Clause.

**2.** *Webster's New Universal Unabridged Dictionary*

## II. WAIVER

We turn now to the question of waiver. As has already been noted, it is generally held that a lessor may waive strict compliance with option provisions. *See Cattle Feeders, Inc.,* 549 S.W.2d at 33 ("[E]quity will also excuse strict compliance where ... prevented by ... waiver ...."); *see also Fun Prod. Distrib., Inc. v. Martens,* 559 P.2d 1054, 1058 (Alaska 1977) (stating that an option provision requiring written notice is for the lessor's benefit and may be waived) (citing *Gruber v. Castleberry,* 23 Ariz.App. 322, 533 P.2d 82, 84 (1975)); *Fleming Companies, Inc. v. Equitable Life Ins. Co. of Iowa,* 16 Kan.App.2d 77, 818 P.2d 813, 822 (1991) (holding strict compliance with a "time for renewal" option provision waivable).

This court in *Soter's, Inc. v. Deseret Federal Savings & Loan Ass'n,* 857 P.2d 935 (Utah 1993), clarified the legal standard necessary to find waiver. Until that time, the case law pertaining to waiver was ambiguous and confusing, sometimes incorrectly stating the law. This "understandably lead[s] to ... erroneous instructions and interrogatories given by the state court," *id.* at 938, especially where the question of intentional relinquishment was at issue. In *Soter's,* this court addressed that confusion, tightening the accepted definition of waiver.

> Because [intentional relinquishment] is intensely fact dependent, evolution of the general issue by Utah's appellate courts, when combined with our tendency to want to generalize rules from our decisions, has produced the increasingly confusing statements of what is needed to show intent, resulting in the present confusion in the law. The way out of the present confusion is to recognize that each set of facts or new case does not call for a new, more particularized statement of the intentional relinquishment element and the facts needed to prove it. Rather, we retreat to a general statement of the law that can be applied to divergent fact situations by finders of fact without undue appellate attempts at be-

909 (1996).

fore-the-fact control over the resulting determinations.

*Id.* at 940. This "general statement" established a test by which a fact finder could determine waiver: "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *Id.* at 942 (footnote omitted) (quoting *Phoenix Ins. Co. v. Heath,* 90 Utah 187, 194, 61 P.2d 308, 311–12 (1936)). This court further stated that "a fact finder should assess the totality of the circumstances to determine whether the relinquishment is clearly intended." *Id.* at 941 (citations omitted). Finally, "any waiver 'must be distinctly made, although it may be express or implied.'" *Id.* at 940.

*Soter's* rejected previous "attempts to spin out further fact-dependent rules about proof of the intentional relinquishment element [of waiver]." *Id.* at 942. However, we now find it necessary to clarify the *Soter's* definition of waiver as it applies in this case. This should not signal the court's desire to return to the narrow, ambiguous, fact-dependent definitions of *Hunter v. Hunter,* 669 P.2d 430 (Utah 1983), and *Rees v. Intermountain Health Care, Inc.,* 808 P.2d 1069 (Utah 1991). Instead, this is a necessary clarification of the definition as it relates to options and option performances, so that questions such as those before us today may be correctly addressed by trial courts.

▉▉▉ Since the performance of options requires a stricter standard than performance of bilateral contracts,[3] it logically follows that a stricter standard is necessary for the waiver of option requirements than that which is required for waiver of bilateral contract provisions. In *Soter's,* this court held "that there is only one legal standard required to establish waiver under Utah law." *Soter's,* 857 P.2d at 942. Our position has not changed; we need not and do not go so far as to establish a separate and more rigor-

ous "clear and convincing" standard with which to deal with option issues. Instead, we urge trial courts to be especially careful in their examination of the evidence in questions of waiver and option performances, especially where such waiver is merely implied. Further, courts should be cautious in finding implied waiver on the part of an optionor unless the totality of the circumstances demonstrates an unambiguous[4] intent to waive the strict compliance required to exercise an option.

In the case at hand, Geisdorf does not argue that there was an express waiver of Doughty's right to receive written notice of Geisdorf's intent to exercise the option to renew. In fact, Geisdorf testified that there was no express waiver. Instead, he maintains that (1) after signing the Lease Agreement, Doughty never requested "that the exercise of the option be in writing" and (2) "the jury reasonably could have inferred from Doughty's conduct and the surrounding circumstances" that Doughty "more likely than not" intended to relinquish her right to receive written notice.

### A. Implied Waiver

"Although the necessary intent may be clear or distinct when there is an express waiver, such intent may be more difficult to prove when waiver is to be implied from conduct or silence." *Soter's,* 857 P.2d at 940.

#### 1. Waiver implied from silence

▉▉ "'[M]ere silence is not a waiver unless there is some duty or obligation to speak.'" *Id.* (quoting *Plateau Mining Co. v. Division of State Lands & Forestry,* 802 P.2d 720, 730 (Utah 1990)) (other citation omitted). It is generally accepted that a duty to speak will not be found where the contracting parties "'deal at arm's length, and where the underlying facts are reasonably within the knowledge of both parties. Under such circumstances, *the plaintiff is obliged to take reasonable steps to inform himself, and to*

---

3. *Jones,* 260 S.W.2d at 199.

4. This term should not signal a deviation from the distinct intent set forth in *Soter's.* We see the term "ambiguous" as synonymous with "indis-

tinct," *see Black's Law Dictionary* 79–80 (6th ed.1990); *see also Webster's New Universal Unabridged Dictionary* 64 (1996), and will use the terms interchangeably.

*protect his own interests.'"* *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 93 (Utah 1988) (emphasis added) (quoting *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980)). *See generally* 37 C.J.S. *Fraud* § 20 (1997).

Geisdorf attempts to make much of the fact that Doughty did not request a written notice of intent to renew before July 15, 1995. However, both parties, as signatories, had copies of the Lease Agreement to which they could refer; the requirement of written notice was thus "reasonably within the knowledge of both parties." *Id.* Doughty had no duty to remind Geisdorf of the necessity to exercise the option by written notice. Geisdorf was responsible to keep himself informed about the continuing provisions under the Lease Agreement and to protect his interests, both current and future, in the leased property. Geisdorf admitted that he did not do this. First, Geisdorf testified he had "forgotten" that the exercise of the option needed to be in writing. He then testified repeatedly that he "never even considered [exercising the option in writing]." Thus, having had ready access to a copy of the Lease Agreement, Geisdorf did not inform himself of, and subsequently protect, his interests under the Lease Agreement.

> Furthermore, this court has held that one party to an agreement does not have a duty to ensure that the other party has a complete and accurate understanding of all terms embodied in a written contract. Rather, each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it. A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense.

*John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1208 (Utah 1987) (citing *Resource Management Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1047 (Utah 1985)) (other citation omitted). Since Geisdorf was obliged to "inform himself," *Copper State Leasing Co.*, 770 P.2d at 93, and had the "burden to understand the terms of the contract," *Resource Management Co.*, 706 P.2d at 1047, Doughty did not have the legal duty to speak for which Geisdorf argues. Doughty's alleged implied waiver could then only be found from an examination of Doughty's conduct under a "totality of the circumstances" standard.

### 2. Waiver implied from conduct

■ Geisdorf points to seven specific events that he contends imply, under the totality of the circumstances, Doughty's intent to waive strict compliance with the written notice provision.[5] His argument about most of these events relies, however, on the premise that Doughty knew or believed that Geisdorf would exercise his option to renew. The remaining events are meetings or circumstances from which no distinct intent to waive the written notice requirement could reasonably be drawn.

After careful consideration of these events, both individually and as a totality, we are led to conclude that they do not support the jury's finding of Doughty's intent to waive the written notice requirement of the Renewal Clause. None of the events show distinct intent, nor can we accept the supposition that these events, individually manifesting indistinct intent, can suddenly and reasonably evince unambiguous intent when taken as a whole.[6]

Geisdorf's belief of what Doughty knew or should have known does not distinctly indicate whether she intended to waive written notice. Similarly, Doughty's assumed knowledge of Geisdorf's intent to exercise the option does not work a waiver of the requirement. This court has held that "[a] mere intention to make a request [for a new lease] was not sufficient," *I.X.L. Furniture*

---

5. In an effort to avoid the "fact-dependency" of *Hunter* and *Rees*, which has been the cause of so much confusion in the courts, we address the individual facts of the instant case for review of sufficiency only. These specific facts should not be considered as "general principles . . . required to show intentional relinquishment in particular cases." *Soter's*, 857 P.2d at 941.

6. There may be instances in which a number of ambiguous events, statements, or examples of conduct may show, in the totality of the circumstances, a distinct intent. We do not wish to create fact-dependent rules concerning intentional relinquishment; as application of this rule is inherently fact-dependent, we do not have occasion today to address this issue.

& *Carpet Installment House v. Berets,* 32 Utah 454, 468, 91 P. 279, 283 (1907), and a lessor's knowledge of that intent is not a sufficient basis for relief. *Id.* Furthermore, neither the discussion about the future payment schedule nor the consultation about painting the building provides distinct inferences to support an intent to waive written notice; myriad possible conclusions can be drawn from either instance. Finally, the argument that the landlord-tenant relationship between these two individuals was cordial and informal is irrelevant. Geisdorf provides no explanation, nor does this court find an explanation as to how this friendly business relationship translates into an implied waiver of the contractual requirements to which both signatory parties agreed.

## CONCLUSION

We uphold the rule of law that barring special circumstances such as misrepresentation or waiver, exercise of an option must be made strictly in accordance with its terms. The lower court erred in instructing the jury that substantial compliance with the terms of the option was all that the law required. Absent waiver, Geisdorf was required to strictly comply with the written notice requirement, which he did not do. Finding waiver of an option requires meeting a stricter standard than does finding waiver under other circumstances. Since the evidence here is "insufficient to support the verdict," *Scudder,* 886 P.2d at 52, we hold the jury's finding of waiver to be in error.

On cross-appeal, Geisdorf seeks remand of this case for a determination that Doughty's failure to replace the business' sign was a breach of the Lease Agreement and seeks an order to replace either the business' sign or an equivalent sign on the building. We reject Geisdorf's requests on the following grounds: First, the jury's general finding that Doughty had breached the Lease Agreement was sufficient to address Geisdorf's concerns in that regard, and damages were awarded accordingly. Second, since we have held that Geisdorf had not appropriately exercised the option to renew the lease, the Lease Agreement is no longer in effect, thus making specific performance impossible.

Therefore, we affirm the trial court's judgment of breach and corresponding damages. However, for reasons explained above, we reverse the remainder of the trial court's judgment and remand for trial on Doughty's counterclaim.

Affirmed in part, reversed in part, and remanded.

DURHAM, Associate C.J., and ZIMMERMAN and RUSSON, JJ., concur in Chief Justice HOWE's opinion.

STEWART, J., does not participate herein.