2005 UT 42

**CCD, L.C., a Utah limited liability company dba United Title Services of Southern Utah, Plaintiff and Appellee,**

v.

**Christopher Lynn MILLSAP, an individual, and The Chris and Sandra Millsap Family Trust, Defendants and Appellants.**

No. 20020875.

Supreme Court of Utah.

July 8, 2005.

Stephen E.W. Hale, Justin P. Matkin, Salt Lake City, for plaintiff.

James C. Bradshaw, Ann Marie Taliaferro, Salt Lake City, for defendants.

NEHRING, Justice:

¶ 1 Christopher Millsap challenges a district court determination that he was lawfully expelled as a member of the limited liability company from which he had diverted money for his own use. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Messrs. Craig Newman, Doug Stanley, and Christopher Millsap formed CCD, a limited liability company, in 1997. The company operated United Title Services of Southern Utah, a title company located in St. George, Utah. Mr. Millsap acted as the man-

ager in St. George. Messrs. Newman and Stanley oversaw marketing in Salt Lake County.

¶ 3 All title companies are required by law to set up trust accounts to hold the money from the closings of real estate transactions and any other funds held by the company when acting as an escrow agent. In March 2000, Messrs. Newman and Stanley discovered that Mr. Millsap had misappropriated $625,000 from CCD's trust account to finance his personal interest in Pheasant Meadow Subdivision in Washington County.

¶ 4 Mr. Millsap admitted to his partners that he took the money. To remedy the situation, CCD's members entered into an amended operating agreement. Under its terms, Mr. Millsap agreed not to access the trust account or write company checks. Mr. Newman consented to lend Mr. Millsap $493,965 to help replace the trust money. Mr. Newman secured the loan with a security interest in Mr. Millsap's ownership interest in CCD. If Mr. Millsap defaulted on the loan, Mr. Millsap's rights to vote his membership interest in CCD would terminate and vest in Mr. Newman. The amended agreement provided that Mr. Millsap's status as a full member in CCD would be restored one year after he timely repaid the loan.

¶ 5 Shortly after the amended agreement was made, at the request of the Utah State Insurance Department, Mr. Newman investigated the source of the funds that Mr. Millsap used to repay the trust account. He discovered that Mr. Millsap had continued to misappropriate trust account funds by using CCD customer file numbers to disguise the transfer of funds obtained in connection with property sales to Mr. Millsap's own company, Gren Development. The second episode of defalcation resulted in trust fund misappropriations totaling $11,540.06.

¶ 6 The parties dispute what happened next. Mr. Millsap says the other members of CCD presented him with what amounted to an extortionate ultimatum: accept a buyout or face disclosure of his crimes to authorities. Mr. Millsap claims that he refused the buy-out and reported his crimes to the insurance commission, an act that led to his being charged with thirteen counts of unlawful

dealing of property by a fiduciary and his pleading guilty to five counts.

¶ 7 Messrs. Newman and Stanley tell a different story. They claim that after they discovered Mr. Millsap's misuse of the trust account, CCD terminated Mr. Millsap's employment. In support of their account, they cite a letter CCD sent to Mr. Millsap, less than a week after his new misappropriations were discovered, advising him that his employment and benefits had been terminated and explaining that he could file for COBRA insurance coverage. The record indicates that two months later Mr. Millsap wrote to CCD requesting COBRA information, demonstrating that Mr. Millsap had received the letter of his termination.

¶ 8 Mr. Millsap contends that his COBRA inquiry notwithstanding, he fulfilled the amended operating agreement conditions, refused the buy-out, and could not be terminated as a member of CCD. According to Mr. Millsap, he had satisfied all of the amended operating agreement conditions for reinstatement as a member of CCD and was, therefore, eligible to retire from the company and enjoy the rights extended to a retiring member under the original operating agreement. Consistent with this understanding, Mr. Millsap wrote CCD a letter giving formal notice of his desire to retire as a member of the company. After receiving the request for an appraisal of Mr. Millsap's interest in CCD in anticipation of retirement, CCD sued Mr. Millsap. The company alleged multiple grounds for relief. Only its claim that it was entitled to a decree expelling Mr. Millsap from CCD concerns us here.

¶ 9 Mr. Millsap and CCD each sought to support their disparate positions by turning to the Utah Limited Liability Act and CCD's operating agreement, which was executed by the three members as required by the Act. Several provisions of the operating agreement play a role in the dispute that led to this appeal.

¶ 10 Specifically, the operating agreement specified that: "[n]o [m]ember may be expelled from the Company by act or desire of the remaining [m]embers"; and that "[n]o [m]ember, without the majority consent of

the [m]embers, shall: use the name, credit or property of the Company for any purposes other than a proper Company purpose." The operating agreement further forbade any member from "any act detrimental to the Company business ... which would make it impossible to carry on business" and in the event of a violation provides that the "[m]ember shall become liable to the Company for the amount of the claim incurred by the Company in connection with said violation of the restriction." Upon the retirement of a member, the operating agreement authorized CCD to acquire the retiring member's interest in the company. If CCD did not elect to purchase the member's interest, the remaining members could acquire the interest. If neither CCD nor the remaining members acquired the interest, then CCD would dissolve and all remaining properties would be distributed in liquidation.

¶ 11 Mr. Millsap moved for summary judgment on CCD's expulsion claim. He argued that since he was "retired" and no longer a member of CCD, he could not be expelled from CCD under section 48–2c–710 of the Utah Limited Liability Company Act.[1] Section 48–2c–710 reads as follows:

> A member of a company may be expelled:
>
> (1) as provided in the company's operating agreement;
>
> (2) by unanimous vote of the other members if it is unlawful to carry on the company's business with the member; or
>
> (3) on application by the company or another member, *by judicial determination that the member:*
>
> > (a) has engaged in wrongful conduct that adversely and materially affected the company's business;
>
> > (b) has willfully or persistently committed a material breach of the articles of organization or operating agreement ...;
>
> > (c) has engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the member.

Utah Code Ann. § 48–2c–710 (2001) (emphasis added).

¶ 12 CCD responded to Mr. Millsap's motion with a cross-motion for summary judgment claiming that it was entitled to expel Mr. Millsap as a matter of law. The district court granted CCD's motion, grounding its ruling on these undisputed facts: (1) Mr. Millsap improperly endorsed checks and withdrew funds from the trust account after the amended operating agreement was signed specifically restricting his right to do so; and (2) Mr. Millsap notified the parties of his intent to retire after CCD filed the lawsuit seeking to expel him.

¶ 13 The court concluded that Mr. Millsap materially breached both the operating agreement and amended operating agreement, and that under the "first to breach" doctrine, he was not entitled to enforce any items of either agreement, including retirement provisions. The court also concluded that Mr. Millsap's wrongful conduct materially affected CCD's business and that under section 48–2c–710 of the Act, the right of a limited liability company to expel a member matures when a wrongful act occurs. Under the district court's interpretation, Mr. Millsap's claim of retirement had no legal relevance. The court also found that there were genuine issues of material fact as to whether Messrs. Newman and Stanley were fraudu-

---

1. Utah enacted the Limited Liability Company Act, Utah Code Ann. §§ 48–2b–101 to –158 (1998) (repealed 2001), in 1991 in response to the need for expanded flexibility and utility in companies with limited liability and pass-through taxation for the owners. Brent R. Armstrong, *New Revisions to Utah's Limited Liability Company Act-the LLC Revolution Rolls On*, Utah State Bar Journal, June/July 2001. The Act provided "default" rules which apply automatically in the absence of rules specified in the governing documents, the articles of organization, or the operating agreement. *Id.*

In 2001, Utah enacted the Revised Limited Liability Company Act, which added new definitions, varying and limiting certain obligations, including the right to expel a member. Ruth Quigley Hawe, Recent Developments in Utah Law, *Utah's Revised Limited Liability Act*, 2001 Utah L.Rev. 1099, 1100–01. The Revised Act was effective July 1, 2001. It repealed and replaced the original Act. We therefore apply the provisions of the Revised Act to the issues of this case.

lently induced to enter into the amended operating agreement with Mr. Millsap.

## STANDARD OF REVIEW

¶ 14 A district court may properly grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Utah R. Civ. P. 56(c). We "review a summary judgment determination for correctness, granting no deference to the [district] court's legal conclusions. We determine only whether the [district] court erred in applying the governing law and whether the [district] court correctly held that there were no disputed issues of material fact." *Wayment v. Clear Channel Broad. Inc.*, 2005 UT 25, ¶ 15, 116 P.3d 271, 2005 WL 858167 (alterations in original) (citations omitted).

## ANALYSIS

¶ 15 This appeal presents us with a variation on the well-worn rhetorical volley between employer and employee: "You're fired!" "You can't fire me, I quit." The legal consequences of the dueling declarations between CCD and Mr. Millsap concerning his separation from CCD are at the core of the matter before us. Orbiting around this central question are a cluster of satellite issues that we must take up. Did Mr. Millsap retire from CCD before he was expelled? If he did and was no longer a member of CCD, could CCD nevertheless expel him? Did Mr. Millsap breach the amended operating agreement when he diverted trust account money to his personal business enterprises, and, if he did, was CCD foreclosed from seeking his expulsion because it waited too long to do anything about it? Does the "first breach" doctrine excuse CCD's refusal to honor Mr. Millsap's attempt to retire?

A. *Under the Language and Policy Considerations of the Revised Limited Liability Company Act, Mr. Millsap was Ineligible for Retirement*

¶ 16 No one disputes that by misappropriating some $625,000 from the trust account of CCD, Mr. Millsap was eligible for expulsion from CCD. Still, if the CCD operating agreement contained the sole grant of authority to members of CCD to respond to the misdeeds of other members, it would be unlikely that CCD could have expelled Mr. Millsap. Section 13 of the agreement imposes an absolute bar to expulsions stating, "[n]o [m]ember may be expelled from the Company by act or desire of the remaining [m]embers." This contractual prohibition is superceded, however, by section 48–2c–120 of the Act, which prohibits an operating agreement from "vary[ing] the right to expel a member based on any event specified in subsection 48–2c–710(3)." Utah Code Ann. § 48–2c–120(1)(f) (2001). Mr. Millsap's conduct could reasonably be interpreted to satisfy one or more of these statutory events. Section 48–20–710 identifies the relevant events and explains the procedure for expulsion this way:

(3) on application by the company or another member, by judicial determination that the member:

(a) has engaged in wrongful conduct that adversely and materially affected the company's business;

(b) has willfully or persistently committed a material breach of the articles of organization or operating agreement or of a duty owed to the company or to the other members under Section 48–2c–807; or

(c) has engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the member.

*Id.* § 48–2c–710(3) (2001).

¶ 17 Although entitled to expel Mr. Millsap for his first episode of misdeeds, Messrs. Newman and Stanley elected instead to extend to Mr. Millsap what they have described as a "second chance." Mr. Millsap's redemption came with conditions embodied in the amended operating agreement. Mr. Newman loaned Mr. Millsap money to repay the company the funds that Mr. Millsap had taken. Mr. Millsap's membership rights, including his right to retire, were suspended until one year had elapsed after he repaid the loan to Mr. Newman. Mr. Millsap insists that, his relapse into converting trust account monies for his own use notwithstanding, he

met the conditions imposed by the amended operating agreement. Having had his membership rights restored and having declared his intention to retire, Mr. Millsap contends that the Act renders him immune from expulsion and requires CCD to treat him as a retiring member under the terms of CCD's initial operating agreement.

¶ 18 Mr. Millsap labors to coax this result from a plain language interpretation of selected provisions of the Act. First, he asserts that the Act supports his contention that by declaring an intent to retire, he terminated his membership in CCD. Section 48–2c–709 (2001) of the Act authorizes members to withdraw upon the happening of events specified in an operating agreement. *Id.* § 48–2c–709 (2001). Because CCD's operating agreement specifically permitted retirement of a member, Mr. Millsap insists that he was permitted to withdraw pursuant to section 709. Next, he asserts that CCD's attempt to expel him was a nullity because section 709 of the Act expressly limits expulsion to members, *see id.*, and at the time CCD filed suit to expel him, he had retired and was no longer a member. We do not read the Act as mandating this result.

¶ 19 Of course, there is a logical tie between the status of membership and the act of being expelled from that status. Mr. Millsap's argument neatly reduces to this syllogism: only members of limited liability companies may be expelled; Mr. Millsap was not a member; therefore, Mr. Millsap could not be expelled. There exists, however, no legal principle that requires legislative enactments to be leashed to Aristotelian logic. While it is true that nonmembership generally moots the necessity of expulsion, it is not always so. We think this is apparent from the language and structure of the Act that the cessation of membership in a limited liability company does not inevitably foreclose expulsion.

¶ 20 Mr. Millsap's plain language reading of the Act strips away from its text all policy considerations associated with limited liability company membership and expulsion and replaces them with a bare mechanical application driven exclusively by considerations of chronology: "I quit before you fired me." Thus, Mr. Millsap's argument features nu-anced discussions of when, if ever, his retirement became effective and how, if at all, his retirement affected his status as a member of CCD. He then turns his attention to a similar inquiry regarding when and whether CCD could have expelled him.

¶ 21 The subtlety and complexity of these explorations is revealed in Mr. Millsap's protracted effort to harmonize a plain language interpretation of when an expulsion becomes effective under section 48–2c–710(3) with the saga of his affiliation with CCD. Section 710(3) explains the procedure and grounds for expelling a member of a limited liability company for cause. *Id.* § 48–2c–710(3). This subsection provides sparse procedural direction, stating that a member may be expelled "on application by the company or another member, by judicial determination." *Id.* An interpretation of this provision based on time and sequence is of vital importance to Mr. Millsap's chronology-driven argument. To Mr. Millsap, this statutory language does not derive its significance from describing *how* an expulsion occurs, but rather exists to define when an expulsion is effective.

¶ 22 If CCD could not expel Mr. Millsap if he were no longer a member, it matters greatly if the effective date of the expulsion were the filing of a lawsuit seeking expulsion, the entry of a final decree of expulsion, or the occurrence of some other event. The importance of extracting from the text of section 710(3) a specific event of expulsion is wholly dependent on the premise that the preeminent concern of the Act is to define and regulate membership. This premise is false. We find unpersuasive Mr. Millsap's contention that the paramount objective of the Act is to fix boundaries between the tenure of a member and the right to expel a member. Put another way, when viewed in the abstract, Mr. Millsap's syllogism is unassailable, but when placed in the context of applying a statute assigned the task of regulating the formation and operation of limited liability companies, that syllogism becomes starkly artificial and irrelevant.

¶ 23 We therefore cannot sidestep testing the likely consequences of Mr. Millsap's favored interpretation—that his retirement terminated his membership in CCD, thereby

rendering his expulsion impossible—against the policy considerations that inform the Act. It is self-evident that a statute establishing the duties and powers of a limited liability company would provide a method to remove a member who subverts the interests of the company through his wrongful acts. The drafters of the Act deemed expulsion authority to be so important that, despite acknowledging the power of limited liability company members to govern their affairs by contract, they expressly barred members from bargaining for expulsion rules that varied from those set out in section 710.

¶ 24 These legitimate policy aims would be frustrated if a member whose conduct made him eligible for expulsion could block expulsion by voluntarily ceasing to be a member, a move that under the terms of the retirement provision of CCD's operating agreement could threaten a forced liquidation of the company. Where the Act takes pains to preserve the statutory expulsion provisions against erosion through the terms of operating agreements, we decline to read its provisions in a manner that sanctions by indirection what the Act directly prohibits. Yet this is precisely what an interpretation of section 710 that conditions expulsion on membership status would do.

¶ 25 It is similarly unlikely that the Act's drafters perceived a need to articulate in detail the interplay between membership and expulsion upon which Mr. Millsap's claim turns. The absence of textual guidance on the relationship between membership status and the right to expel does not, in our view, support Mr. Millsap's plain language interpretation. To the contrary, if the drafters of the Act had intended that its provisions be interpreted in a way that imposed a substantial burden on a limited liability company's right to expel a member based solely on the timing considerations tied to the member's voluntary secession from membership, they would reasonably have been expected to have been more attentive to setting out the substantive and procedural parameters of membership secession and expulsion. Were we to adopt Mr. Millsap's chronology-driven interpretation, we would be compelled to engraft onto the Act timing benchmarks of our making that would permit us to determine whether CCD expelled Mr. Millsap before he terminated his membership. The alternative is to construe the meaning of the Act in a manner consonant with its policy objectives. Faced with these choices, we elect to interpret the Act in light of its underlying policy rather than an artificial construction unrelated to the Act's purpose.

¶ 26 In Mr. Millsap's view, any policy-based interpretation of the Act that would permit the expulsion of a retired or withdrawn member targets the wrong source of potential mischief. According to Mr. Millsap, the Act should be interpreted in a manner that best protects a member like himself from a company's bad faith expulsion efforts. The prospect that such abuse can occur assumes that courts are either incapable or unwilling to make informed and impartial judgments about the merits of expulsion actions brought under section 710. This is an assumption that Mr. Millsap has failed to support with any facts. The requirement that expulsions be made by judicial determination affords members like Mr. Millsap, through the intervention of a neutral and impartial fact finder, the most reliable safeguard against inequitable treatment available in our society.

¶ 27 Indeed, the greater risk of over-reaching would arise from Mr. Millsap's preferred interpretation. A member who has engaged in wrongdoing that would expose him to expulsion would command unjustifiable leverage were he to be able to force a dissolution of the company by withdrawing as a member before the company could obtain a judicial determination that he should be expelled.

¶ 28 Moreover, we are wary of embracing statutory interpretations that confer legal rights based on victories in races to the courthouse. The proper focus of inquiry should be on the merits of claims concerning a limited liability company members's conduct and not on reviewing the results of photo finishes to the courthouse door. Accordingly, we reject the premise that underlies Mr. Millsap's argument that because his announced retirement predated the judicial

determination of his expulsion, he could not be expelled as a member of CCD.

¶ 29 As a result of our interpretation of the Act, we affirm the district court's conclusion that the Act authorized Mr. Millsap's expulsion. Our conviction that the Act's expulsion provisions are not solely dependent on considerations of chronology renders unnecessary the district court's invocation of the "first breach" doctrine. We have explained that under the "first breach" rule "a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform." *Jackson v. Rich,* 28 Utah 2d 134, 499 P.2d 279, 280 (1972). "He can neither insist on performance by the other party nor maintain an action against the other party for a subsequent failure to perform." *Id.* The district court applied this doctrine to conclude that Mr. Millsap's misuse of company funds constituted a breach of the initial and amended operating agreements that deprived him of the right to enforce the operating agreement's retirement provisions. Under our interpretation of the Act, CCD had the right to seek the statutory expulsion of Mr. Millsap even if he had not forfeited his right to retire or had taken steps to exercise that right.

¶ 30 Having determined that CCD's right to seek the expulsion of Mr. Millsap survived his attempts to retire, we now take up Mr. Millsap's challenge to the district court's determination that CCD established through undisputed facts sufficient grounds to expel Mr. Millsap as a member of CCD. The district court found that under the terms of the amended operating agreement Mr. Millsap had "no authority to withdraw funds from CCD's general or escrow accounts," and that, notwithstanding this restriction, he endorsed checks drawn on the company's trust account, thereby breaching the agreement. The district court concluded that Mr. Millsap's breach constituted wrongful conduct that "adversely and materially affected

CCD's business" and that thus met the requirement for expulsion.

¶ 31 Mr. Millsap takes issue with this finding and conclusion for two reasons: he contends that these indiscretions were not grave enough to permit expulsion and that, even if they were, CCD waived its right to complain about them. We will discuss each of these matters in turn.

¶ 32 According to Mr. Millsap's view of the Act, expulsion is permitted only in response to an ongoing threat to the company. Like Mr. Millsap's argument concerning the effect of membership status on the statutory right to expel a member, this attack on the district court's interpretation of the Act turns on the court's alleged failure to acknowledge the preeminent role that time plays in a limited liability company's authority to expel a member. That vice is, according to Mr. Millsap, evident here because the district court permitted Mr. Millsap to be expelled for stale misdeeds that, as a matter of law, could no longer adversely and materially affect CCD's business. CCD concedes that it did not seek Mr. Millsap's expulsion based on his misconduct known to CCD at the time it entered into the amended operating agreement. Therefore, Mr. Millsap asserts, no lawful basis existed for his expulsion. We disagree.

¶ 33 It is undisputed that Mr. Millsap misappropriated trust account funds totaling at least $11,540.06 for his personal use after the amended operating agreement was signed. It is difficult for us to find justification for reversing the district court's conclusion that this behavior merited expulsion. Mr. Millsap's misconduct continued the pattern of behavior that resulted in losses to the company of $625,000. It took place after Mr. Millsap's prior wrongdoing had been discovered and after CCD had assented to permit Mr. Millsap to atone for his misdeeds by fulfilling the terms of the amended operating agreement.[2]

---

2. Mr. Millsap points to remarks made by the district court from the bench indicating that the court believed that the misappropriations of funds made by Mr. Millsap after executing the amended operating agreement to be immaterial. We see no reason to treat these remarks, to the exclusion of the district court's written findings

of fact and conclusions of law, as the court's final pronouncements on the matter despite Mr. Millsap's protestations that the written findings and conclusions were nothing more than CCD's revisionist account of the events at the hearing that resulted in the court's ruling. The district court stood by the written findings and conclusions in

¶ 34 We are also unpersuaded that CCD waived its right to expel Mr. Millsap for his second episode of misconduct. "A waiver is the intentional relinquishment of a known right." *Geisdorf v. Doughty*, 972 P.2d 67, 72 (Utah 1998). CCD acknowledges that it waived its right to expel Mr. Millsap for his first episode of defalcation when it entered into the amended operating agreement. The record contains no evidence, however, to indicate that CCD intended to relinquish its right to seek the expulsion of Mr. Millsap for misconduct that occurred after the amended operating agreement became effective. Moreover, we find no merit in Mr. Millsap's contention that CCD's only recourse, upon discovering that Mr. Millsap had continued to misappropriate company funds, was to further amend the operating agreement. Such a limitation on CCD's options would have varied the statutory provisions relating to the grounds for expulsion and would therefore be unenforceable under section 48–2c–120(1)(f).

## CONCLUSION

¶ 35 The district court properly ruled that CCD could expel Mr. Millsap as a member of the limited liability company for his misappropriation of company funds. His effort to block his expulsion by attempting to retire was unavailing and did not cut off his exposure to a judicially determined statutory expulsion. Affirmed.

¶ 36 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.

the face of Mr. Millsap's objection to their form and a motion to reconsider, and we therefore presume their validity.