(818 P.2d 813)

No. 66,051

FLEMING COMPANIES, INC., *Appellee*, v. EQUITABLE LIFE INSURANCE COMPANY OF IOWA, *Appellant*.

Opinion filed October 4, 1991.

*Paul E. Vardeman* and *Mary Jo Shaney*, of Polsinelli, White, Vardeman & Shalton, of Kansas City, Missouri, and *Frank A. Caro, Jr.*, and *Bruce W. Beye*, of the same firm, of Overland Park, for the appellant.

*Gordon E. Wells, Jr., Jim Tierney, John L. Vratil*, and *Laura J. Bond*, of Lathrop & Norquist, of Overland Park, for the appellee.

Before ELLIOTT, P.J., PIERRON, J., and WILLIAM M. COOK, District Judge, assigned.

PIERRON, J.: Equitable Life Insurance Company of Iowa (Equitable) appeals from the summary judgment granted to Fleming Companies, Inc., (Fleming) on Fleming's petition for declaratory judgment. Fleming had asked the district court to declare its exercise of an option to renew, contained in a certain lease agreement, effective notwithstanding it had given oral notice five weeks after the date expressed in the lease for the notice to have been given in writing.

The facts in this case are fairly detailed but generally uncontested by the parties. In August 1958, Fleming and Equitable began a series of financial transactions which culminated in a purchase/leaseback agreement. On April 30, 1959, Fleming entered into a Contract for Lease with Equitable whereby Fleming agreed to construct a warehouse facility on certain property and to sell it and the land to Equitable at a price equal to the cost Fleming paid for the land and the completed improvements. The contract further provided that Equitable would then lease the premises back to Fleming.

The parties entered into an Indenture of Lease (lease) on May 28, 1959, whereby Equitable agreed to lease 28.21 acres of land and a warehouse on the land to Fleming for 30 years. The lease term began on November 30, 1960, and ended on November 30, 1990. The lease costs were determined in advance and were calculated so that at the end of 30 years Equitable would have recovered the purchase price and a fixed rate of return on the funds it advanced for the purchase. The lease provided that all permanent additions to the building, except the cold room insulation and refrigeration equipment, would become part of the leased premises and belong to Equitable upon termination of the lease.

The lease provided Fleming with the right, at its option, to renew the lease after expiration of the original term of 30 years and one day by serving a written notice of renewal upon Equitable at least one year before the expiration of the lease. The key date for Fleming to exercise the option to renew the lease was thus on or before November 30, 1989. Neither party disputes the fact that Fleming did not give proper written notice of renewal to Equitable by November 30, 1989.

Leading up to November 1989, Ron Bond was the Fleming employee responsible for the day-to-day monitoring of Fleming's leases. Bond was a Senior Corporate Financial Analyst and had been with Fleming for approximately 10 years. The internal lease monitoring procedures which Bond had developed showed him in early 1989 that the lease with Equitable would be up for renewal in November 1989.

On June 15, 1989, Bond sent a memo, pursuant to his own standard operating procedure, to Bill Dougherty (controller, Mid-America Region), Jim Costello (president, Topeka Division), and Bob Wilson (controller, Topeka Division) advising them that the term of the lease expired November 30, 1990, and that notice of renewal was due to Equitable by November 30, 1989. Bond requested that they provide him with their intentions regarding renewal of the lease. Bond himself did not have the requisite authority to renew the lease on behalf of the corporation. On July 5, 1989, the Topeka Division advised its supervisors at the Mid-America Region level of its recommendation to renew the lease. The Regional Distribution Director of Fleming then contacted Bond and Steve Davis, one of Bond's supervisors who did have actual authority to renew the lease, to confirm that: "The Mid-America Region does want to exercise the option to extend the lease which 'expires November 30, 1990,' for the 5-year period from December 1, 1990, through November 30, 1995."

Fleming terminated Ron Bond's employment on November 10, 1989, due to a company-wide reduction in force. The parties dispute what, if anything, Bond told his supervisors at Fleming following his termination. Bond himself stated that prior to leaving the office on November 10, he met with John Thompson, his immediate supervisor and Fleming's treasurer, and provided him with a folder containing leases that required "immediate attention." Bond maintains that Thompson did not ask specifically about the lease in question and that Bond did not tell Thompson or Steve Davis that the lease had been renewed. In his deposition, Thompson stated that on November 1, 1989, he inquired of Bond as to the status of pending lease activity and that Bond replied the Topeka warehouse lease had been renewed. Both Thompson and David Levine, Assistant Treasurer of Fleming, stated Bond told them before he left on November 10 that nothing

needed to be done on the Topeka warehouse lease and that it had been taken care of. However, it does not appear from the facts that any of Bond's superiors verified that renewal had actually been made.

David Levine assumed Bond's responsibilities for day-to-day monitoring of Fleming's leases and began a systematic, alphabetical audit of all Fleming's lease files. On January 4, 1990, Fleming discovered that written notice of exercise of the option under the lease had not been given by November 30, 1989. That same day Thompson called Equitable to express Fleming's intent to exercise the option and to request a waiver of the deadline. On January 5, 1990, Gary Swon of Equitable returned Thompson's call and indicated that the matter was under scrutiny and that Equitable would convey its position by January 12, 1990.

On January 10, 1990, Swon wrote Thompson and advised Fleming for the first time that Fleming had not given proper, timely notice of its intention to renew and that the lease term would expire on November 30, 1990, as the contract provided. Upon receipt of this letter, Fleming wrote Equitable on January 12, 1990, giving formal written notice of its intent to renew. Equitable responded by letter dated January 22, 1990, stating it considered the late notice of no effect.

Meanwhile, several employees of Equitable knew and had known that written renewal of the lease was required to be given by Fleming by November 30, 1989. These Equitable employees had discussed the issue of the renewal prior to its due date and elected not to take any action to assist or remind Fleming of its renewal option.

Under the lease, Fleming had been paying Equitable $88,958.76 per year as rent, but rent for the five-year renewal period would only be $48,000 per year, based on the terms of the original lease. Furthermore, market rental rate for the facility per year had been appraised at $580,000 to $720,000. Based on these economic considerations, Equitable determined, both prior to and after the deadline had passed, that the lease with Fleming would be allowed to expire and Equitable would then renegotiate with Fleming for a higher rental payment than the lease provided or, in the alternative, seek a new tenant for the property.

Fleming filed a Petition for Declaratory Judgment on April 16, 1990, asking the district court to find that Fleming had effectively exercised the renewal option and that the lease had been validly extended until November 30, 1995, at the contractual renewal rental rate of $48,000. Equitable filed a Counterclaim for Declaratory Judgment, asking the court to find that Fleming had failed to renew the lease, and that Equitable could properly terminate and negotiate new lease terms with Fleming. In a memorandum opinion and entry of judgment dated November 29, 1990, the district court entered summary judgment for plaintiff Fleming and against defendant Equitable, declaring the lease between the parties to have been renewed for an additional five years beginning December 1, 1990, by written notice transmitted January 12, 1990. The court further denied Equitable's motion for summary judgment and found that its counterclaim failed to state a claim upon which relief could be granted. Equitable filed a timely notice of appeal in district court on December 21, 1990.

The standard for summary judgment rulings is well established.

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citations omitted.] When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. [Citations omitted.]" *Patterson v. Brouhard*, 246 Kan. 700, 702-03, 792 P.2d 983 (1990).

See *Hammig v. Ford*, 246 Kan. 70, 72, 785 P.2d 977 (1990).

"When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. [Citation omitted.] In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact could not affect the judgment, it does not present a genuine issue of material fact. [Citation omitted.]" *Knudsen v. Kansas Gas & Electric Co.*, 248 Kan. 469, 483, 807 P.2d 71 (1991); *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, Syl. ¶ 2, 790 P.2d 404 (1990).

Equitable contends there were material issues of fact to be resolved which precluded summary judgment. The district court

found that Fleming's failure to renew the lease was a "mistake," but Equitable claims the court could not properly reach such a conclusion in light of the factual dispute regarding the renewal. Equitable further argues Fleming was negligent in mishandling the renewal and the district court failed to focus on any of the facts which would suggest possible negligence and which would controvert the court's finding that Fleming's failure to renew was a result of mistake.

The parties dispute the facts surrounding the circumstances of the lease renewal, but the district court felt it was doubtful the truth "between the version expressed by Ron Bond versus the version advanced by John Thompson and David Levine can be securely judicially ascertained. If facts were available to advance the analysis of truth better, such facts would have been advanced by able counsel."

Equitable contends that whether Fleming was negligent is a *material* issue, for if Fleming is found negligent, such negligence ought to prevent Fleming from profiting thereby in equity. Fleming counters that the characterization of its conduct is irrelevant to the outcome of the case. Furthermore, Fleming argues that, even if the actions by its employees *were* negligent, this would not preclude summary judgment from being entered in Fleming's favor because cases such as *Car-X Service Systems, Inc. v. Kidd-Heller*, 927 F.2d 511 (10th Cir. 1991), and *Fountain Co. v. Stein*, 97 Conn. 619, 118 A. 47 (1922), will allow equitable relief even if the party is negligent, provided that certain other factors are present.

Based on the standard of review, the characterization of Fleming's actions as negligent or simply mistaken must be material to the case or the appellate court must find that summary judgment was properly granted. Fleming is correct in stating that should the court adopt the rule of *Fountain* and *Car-X*, the characterization of Fleming's actions is irrelevant as long as its conduct was not intentional, willful, or grossly negligent. Should the court reject the principles of *Fountain* and *Car-X* and hold that mere negligence operates as a bar to equitable intervention in this situation, the characterization of Fleming's conduct will become crucial to the outcome and may call for further development at the trial level.

Fleming maintains the district court properly followed the majority of jurisdictions in the application of equitable principles to determine that Fleming effectively exercised the option to renew. Although there is no Kansas case law directly on point, Fleming argues existing Kansas cases indicate this court should adopt the reasoning in *Fountain* and *Car-X*. These cases would allow equity to intervene under certain circumstances even if Fleming's actions were negligent.

Equitable argues the *Fountain* line of cases is an exception to the long-established general rule that equity will not intervene in a contract issue in the absence of fraud, mistake, or duress. Equitable relies on *Reynolds-Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237 (Tex. App. 1978), and similar cases to support the proposition that negligence in failing to timely exercise an option to renew bars equitable relief.

"This court's review of conclusions of law is unlimited." *Hutchinson Nat'l Bank & Tr. Co. v. Brown*, 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

Kansas courts have not specifically addressed the application of equitable principles to a situation involving untimely renewal of a commercial lease of real property. However, other Kansas cases which discuss the use of equity in the contract/lease context are helpful.

In *Squires v. Woodbury*, 5 Kan. App. 2d 596, 601, 621 P.2d 443 (1980), *rev. denied* 229 Kan. 671 (1981), the court held the trial court had improperly reformed the lease where there was no evidence of fraud, duress, undue influence, unconscionability, or the like. The plaintiff in *Squires* claimed her inadequate eyesight prevented her from understanding the terms of the lease, but the court held her to the terms of the contract. "The general rule is that competent parties may make contracts on their own terms . . . and in the absence of fraud, mistake or duress, a party who has entered into such a contract is bound thereby." 5 Kan. App. 2d at 598. See also *John Deere Leasing Co. v. Blubaugh*, 636 F. Supp. 1569 (D. Kan. 1986) (general rule cited).

However, the court in *Squires* did recognize that "there is authority for the proposition that unilateral error may be a good defense to a contract where hardship amounting to injustice would be inflicted by holding a party to the agreement, and where it

would be harsh and unreasonable to enforce the agreement." 5 Kan. App. 2d at 599. This exception would not apply here, for Fleming does not argue that it misunderstood the requirements for renewal; Fleming contends the company was "mistaken" as to whether the notice had actually been given. This type of mistake is outside the scope of *Squires.*

. Kansas cases discussing equity only clearly exclude willful, intentional, indifferent, or grossly negligent conduct; mere negligence alone does not appear to bar equitable intervention. In his memorandum opinion, the district court judge cites to. *Missouri River, Ft. S.& G. R. Co. v. Brickley,* 21 Kan. 206 (1878), as an example of "this judicial attitude and characterization."

". 'And even when time is not thus either expressly or impliedly of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been *inexcusably* negligent in performing the contract on his part; or if there has, in the intermediate period, been a material change of circumstances, affecting the rights, interests, or obligations of the parties, in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust. But except under circumstances of this sort, or of an analogous nature, time is not treated by courts of equity as of the essence of the contract; and relief will be decreed to the party who seeks it if he has not been *grossly negligent* and comes within a reasonable time, although he has not complied with the strict terms of the contract.' " 21 Kan. at 221. (Emphasis added.)

There is no evidence in the record to suggest that Fleming's actions were intentional, willful, or even inexcusably negligent, although Equitable would probably disagree about the character of Fleming's actions.

Equity has been allowed a foot in the door in a few Kansas lease cases based on the general rule that forfeitures are not favored in the law. *Greenwood v. Estes, Savings & Loan Commissioner,* 210 Kan. 655, 657, 504 P.2d 206 (1972). See *Letzig v. Rupert, Executor,* 209 Kan. 143, 146, 495 P.2d 955 (1972) (equity allowed to intervene to determine whether a forfeiture should be decreed in a rental purchase agreement); *Kays v. Little,* 103 Kan. 461, 175 Pac. 149 (1918) (court denied cancellation of an oil and gas lease for slight delay in payment where equitable factors were present).

There is, however, case law in Kansas to the effect that equity should not relieve a party from the consequences of its own folly or assist it when its condition is attributable to a failure to exercise ordinary care for its protection. *Great Western Mfg. Co. v. Adams*, 176 F. 325, 327 (C.C.A. Kan. 1910). See *Bowen v. Westerhaus*, 224 Kan. 42, 50, 578 P.2d 1102 (1978) ("Equity aids the vigilant.").

In *Gill Mortuary v. Sutoris, Inc.*, 207 Kan. 557, 485 P.2d 1377 (1971), a commercial lessee of billboard space sued the lessor, seeking specific performance of two lease agreements after a futile attempt by the lessee to exercise options to renew both leases. The district court dismissed the lessee's action, noting the lessee had not only failed to prove it was entitled to specific performance, but also that the lessee's evidence "is insufficient to establish any right, in equity, to compel the defendants . . . to specifically perform said lease agreements." 207 Kan. at 560. The Supreme Court of Kansas affirmed. The Tenth Circuit Court of Appeals in *Car-X*, 927 F.2d 511, used the facts and resolution of *Gill* to support the proposition that equitable relief *may* be appropriate under Kansas law in certain circumstances for situations involving an untimely renewal of a commercial lease of real property, even if not proper under the specific facts of *Gill*.

The facts of *Car-X* are similar to those in the present case. The issue on appeal was "whether the district court erred in granting equitable relief to a lessee who failed to timely exercise its right to renew a five-year lease of commercial property for an additional five years." 927 F.2d at 511. The lease required the lessee, Car-X, to renew the lease at least six months before the original term expired. Car-X gave its notice of renewal four and one-half months late. The district court held that, "all things considered, Car-X should not be held to the six months requirement." 927 F.2d at 515. The district court reached this conclusion based on the fact that the current five-year lease term had not yet expired when Car-X gave its notice of intent to renew; that the lessor did not contend that she never received a copy of the notice; that to declare the option as lost would do relatively great harm to the lessee Car-X; and that by allowing Car-X to remain as lessee for an additional five years would do relatively little harm to the lessor. 927 F.2d at 515. On appeal, the Tenth Circuit

affirmed the district court's ruling, noting further that this case did not involve an intentional or willful failure to timely renew. 927 F.2d at 516.

The situation in the present case closely parallels that of *Car-X*. The 30-year original lease term had not yet expired when Fleming properly tendered written notice of its intent to renew on January 12, 1990. Equitable does not dispute the fact it received such notice; Equitable's letter of January 22, 1990, acknowledges its receipt. To declare the option as lost would do relatively great harm to Fleming. In addition to the loss of future use for a possible 20 years of its capital investment (4, 5-year extensions), termination of the lease as of November 30, 1990, would most likely result in the loss of approximately 230 jobs in Topeka and would cost Fleming approximately $4.8 million, which includes the loss of approximately $1.8 million in unamortized leasehold improvements, substantial employee termination, and relocation and moving costs. By allowing Fleming to remain as lessee for an additional five-year period would do relatively little harm to Equitable. Equitable has not actively tried to market the property nor is there any evidence on record that Equitable has received any offers from third parties to buy or lease the premises. Of course, with these proceedings pending, such effort would not likely lead to much in the way of results.

One key difference in this case from *Car-X* is the fact that the rental amount to be paid by Fleming during the renewal period will decrease from $88,958.76 to $48,000, both of which are substantially lower than the market rental rate of $580,000 to $720,000. In *Car-X*, the rental rate for the renewal period increased from the rental rate of the original lease term. While this factor is relevant, it does not appear dispositive in light of other considerations, most notably the potential $4.8 million loss by Fleming. Moreover, the rental rate for the renewal period is provided in the lease between the parties to which Equitable originally agreed.

The significant increase in market rental rate for the property is due in large part to the improvements Fleming has made on the property. Over the life of the lease, Fleming has made capital improvements to the premises totaling $5,016,851 as of September 1990. Of those total improvements, approximately $2,700,000

were constructed and installed in 1980 and 1981. Further improvements totalling over $300,000 were completed in 1988, and improvements totalling $400,000 were made in 1989. The present value of the property is largely a result of Fleming's additions and improvements; to argue Fleming should pay more rent because the property is now worth much more in the open market due to Fleming's own efforts is inequitable.

Both parties argue as persuasive authority cases outside this jurisdiction. Fleming relies heavily on the line of cases beginning with *Fountain Co. v. Stein*, 97 Conn. 619, 118 A. 47 (1922). The lessee in that case failed to exercise his option to renew within the 30 days provided in the contract. The court held that, because the notice was not timely given, the plaintiff-lessee had "no right to relief unless it can establish . . . such facts as will bring it within the power of equity to relieve." 97 Conn. at 623. The court went on to establish the rule that

"in cases of wilful or gross negligence in failing to fulfil [*sic*] a condition precedent of a lease, equity will never relieve. But in case of mere neglect in fulfilling a condition precedent of a lease, which do not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." 97 Conn. at 626-27.

The court also noted that a commercial lessee who has made substantial improvements has an equitable interest in the renewal period in view of the character of the lease and what the lessee has done under it. 97 Conn. at 625.

Cases further discussing this issue are compiled in an annotation which indicates that most courts which have dealt with this issue have recognized there can be special circumstances which may warrant equitable relief from a lessee's failure to give notice to renew an option in its lease. See Annot., 27 A.L.R.4th 266.

Equitable relies on cases such as *Reynolds-Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237 (Tex. App. 1978), in which the court held that mere neglect of the lessee in failing to timely exercise its option, absent other ameliorating circumstances such as fraud, misleading statements or acts by the lessor, or waiver, does not justify the interposition of equity to rewrite a lease even though it may result in hardship to the lessee. 567 S.W.2d at

239. The *Reynolds-Penland* court expressly rejected *Fountain*, stating that if such a rule were accepted, "all contracts would be called into question as meaningless and uncertain, dependent upon the whims of a panacean court or a jury." 567 S.W.2d at 241. See *McClellan v. Ashley*, 200 Va. 38, 104 S.E.2d 55 (1958) (court rejects *Fountain* as being too broad).

The rule in *Reynolds-Penland* is of questionable authority and validity, because a subsequent Texas Court of Appeals case expressly abandoned the majority holding in *Reynolds-Penland*. In the view of that court, *Reynolds-Penland* could not stand in the face of a prior Texas Supreme Court case, *Jones, Administrator v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265 (1939), which appeared to follow the rule established in *Fountain*. See *Inn of Hills, Ltd. v. Schulgen & Kaiser*, 723 S.W.2d 299, 301 (Tex. App. 1987). Other cases adopting the rule in *Reynolds-Penland* are still good law and are cited by Equitable. See, *e.g.*, *Western Tire, Inc. v. Skrede*, 307 N.W.2d 558 (N.D. 1981) (lessee who failed to meet the requirements of the lease both as to the manner and the time period required for exercise of the option to renew was not entitled to equitable relief from forfeiture of the lease where failure to grant relief did not render the liberal enforcement of the renewal provision unconscionable, and where the landlord was prejudiced by having to accept inadequate rentals in comparison to what similar properties in the vicinity commanded). But see *Fletcher v. Frisbee*, 119 N.H. 555, 404 A.2d 1106 (1979) (that the landlord could have leased property more advantageously not always sufficient to defeat a lessee's claim for equitable relief).

The issue thus becomes whether this court should allow Fleming to prevail even though it caused the harm about which it complains, or whether Fleming should be denied relief and forced to vacate the premises or pay a much higher rate of rent for failure to give proper notice to renew. Under both *Fountain* and *Car-X*, the characterization of Fleming's conduct as negligent or mistaken is basically irrelevant. As long as its conduct was not intentional, willful, or grossly negligent, Fleming would prevail. Equitable might attempt to argue that failure to renew a lease of such value to the company would amount to gross negligence, but this is not supported by the facts of record.

Adoption of the *Fountain* rule, specifically limited to the type of situation involved in the present case, would not unduly render all lease contracts uncertain and their terms questionable. Moreover, in light of all the factual considerations in this case, the balance seems to fall on Fleming's side. Equitable made no significant change in reliance on the missed deadlines; it did not actively seek to lease or sell the property to a third party. Equitable most likely intended all along to simply allow the deadline for renewal to pass and then renegotiate with Fleming for a higher rental rate, armed with the club of termination of the lease and forfeiture of the very substantial improvements should Fleming refuse. Also, Equitable argues for the sanctity of contracts and the need for judicial respect of their bargained-for terms; yet it clearly wants to avoid the rental rate for the renewal period as expressed in the original contract between the parties. Equitable asked the district court in its counterclaim essentially to force Fleming to the table to renegotiate future rental payments.

The most salient facts leading to the conclusion that Fleming should be allowed equitable intervention by the court are as follows:

1. The failure by Fleming to give notice has not been shown to be the result of intentional, willful, or grossly negligent behavior.

2. An apparent inequitable forfeiture will result if the court does not intervene. Fleming made substantial improvements in 1988 and 1989 worth $700,000, presumably with the intent of exercising the option and remaining on the premises, and had made even more substantial improvements in the past.

3. As a result of Fleming's failure to give timely notice, Equitable did not change its position in any significant way and was arguably not prejudiced thereby.

To properly review this matter it is necessary to determine whether the district court erred in finding that time was not of the essence under the lease.

"The standard of appellate review of findings of fact has been stated numerous times by this court. The court must determine if the findings are supported by substantial competent evidence and whether they are sufficient to support the trial court's conclusions of law." *Army Nat'l Bank v. Equity Developers, Inc.,*

245 Kan. 3, 19, 774 P.2d 919 (1989). See *State ex rel. Love v. One 1967 Chevrolet*, 247 Kan. 469, 473, 799 P.2d 1043 (1990).

The language of the option provision itself does not expressly state that time is of the essence, nor does this language appear anywhere in the body of the lease.

In a situation involving an option to purchase real estate, "[t]he failure of the contract to make time of the essence of the agreement is of no consequence, because time is of the essence of such a contract in any event." *Anderson v. Ericson*, 149 Kan. 270, 273, 87 P.2d 540 (1939). See also *Loose v. Brubacher*, 219 Kan. 727, 732, 549 P.2d 991 (1976) ("Time has been held to be of the essence in an option agreement whether or not so expressed."). Both of the above cases deal with options to purchase real estate, but Equitable argues they would operate to imply that time is always of the essence in an option to renew a lease as well. No Kansas cases are on point.

In *Fletcher v. Frisbee*, 119 N.H. 555, 404 A.2d 1106 (1976), the court held that time is of the essence in option agreements, and that this rule is applicable to a lessee who wishes to exercise a lease-renewal option. However, the court stated that equity will give relief where the delay is slight, the lessor is not prejudiced, and literal enforcement of the provision would produce an unconscionable result for the lessee. 119 N.H. at 558-59. The court found in favor of the lessee, stating the only prejudice the lessor suffered was that it did not consider sale of the property until after receiving late notice of renewal. Any hardship to the lessor resulted from the tenant's mere presence on the premises. 119 N.H. at 558.

Equitable states in its brief that the purpose of the one-year notice provision was to give Equitable ample time to find a new tenant should Fleming choose not to renew the lease. The facts disclose that Equitable took no action with regard to the property following November 30, 1989. The trial court held:

"Time is not of such essence that a 35-42 day omission (out of the approximately 10,950 days of the base lease and the 18,250 days of the potential total lease period available with renewals) cannot be equitably excused if the failure did not amount to intentional, willful, indifferent, or grossly negligent conduct or waiver and no prejudice *from the delay* is shown to have impacted the lessor." (Emphasis in original.)

Equitable claims it has been prejudiced by the delay of Fleming in renewing the lease. "Because Fleming's Lease rights would terminate absent renewal, Equitable's rights in the option renewal provision would ripen into the right to terminate the Lease and market the property at present value." It is unclear how Fleming's delay in renewing could have prejudiced or damaged Equitable when it took no steps following the missed deadlines to negotiate with any party for sale or lease of the property.

Where the lease expressly provides for the time when the renewal is to be made and the manner in which it is to be given, such provision controls. 51C C.J.S., Landlord & Tenant § 59. "[I] the absence of a waiver or of special circumstances warranting equitable relief, the right to the renewal is lost on failure to comply with the provision, regardless of the fact that the landlord may have suffered no damage by reason of the tenant's delay." 51C C.J.S., Landlord & Tenant § 59, pp. 185-86. Strict compliance with a provision fixing the time for renewal may be waived. See *Wharf Restaurant, Inc. v. Port of Seattle*, 24 Wash. App. 601, 605 P.2d 334 (1979).

Fleming argues that Equitable, by the course of its conduct, waived the requirement of timely notice to renew the option. Fleming points out that on several occasions over the life of the 30-year lease, Equitable accepted late payments and notifications from Fleming without objection, thus waiving any implied provision that time is of the essence. For example, in August 1960, Fleming was late in paying an installment of $4,000 on its commitment fee, but Equitable accepted it without objection. Also, in January 1961, Fleming was late in making a rent payment, but it was again accepted without objection. Fleming also points to the fact that Equitable has given Fleming *advance* notice several times of upcoming deadlines under the lease, such as when property taxes were coming due.

As stated by the trial court: "The evidence reflects over the course of the years an attitude of mutual cooperation and assistance in fulfilling the lease conditions where mutual interest was involved such as expedited approval for addition construction plans, extensions where needed, and advisories as to taxes due." However, the fact that the parties maintained an amicable busi-

ness relationship does not of itself constitute waiver of a specific date for exercising the option to renew the lease. It does not appear from the facts that Fleming's failure to give timely notice was based on reliance of Equitable's prior conduct during the lease term.

The trial court fully and ably analyzed the facts and law. In its comprehensive written opinion, the court states:

"This court finds that given recognition of an equitable interest in renewal by virtue of the character of the lease before the court, the slight delay, the obvious unconscionability that would attend the undesired abandonment of the lease by Fleming Companies, Inc., and the existence of absolutely no legal prejudice to the defendant Equitable Life Insurance Company of Iowa, that equity should intervene here as Fleming's conduct in arriving at its omission of notice was not intentional, indifferent, willful, or grossly negligent."

We agree.

Affirmed.