U SAVE FOODS, INC., formerly Sixth Street Food Stores, Inc., a/k/a Sixth Street Foods, Inc., a Nebraska corporation, Plaintiff,

v.

NASH–FINCH COMPANY, a Delaware corporation, Defendant.

No. 00–1118–JTM.

United States District Court, D. Kansas.

Jan. 18, 2001.

**1308**

Rick E. Bailey, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Wichita, KS, for U Save Foods Inc.

Susan P. Selvidge, Scott D. Jensen, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for Nash–Finch Co.

## MEMORANDUM ORDER

MARTEN, District Judge.

The matter is before the court on cross-motions for summary judgment by plaintiff U Save Foods (previously known and identified herein as Sixth Street Food Stores) and defendant Nash Finch. The facts are not in any substantial dispute.

■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

■ In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in Matsushita). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Nash Finch's primary business is wholesale food supplier to independent grocers, and it also operates some corporate supermarkets.

Sixth Street operates 13 supermarkets in Kansas, Nebraska, and Colorado.. It has an exempt staff of 58 persons, and has 1200 to 1400 employees. It also has other businesses, including rental properties and wholesaling of food commodities, and has

offices in North Platte and Omaha, Nebraska. During the relevant time period, Sixth Street had 39 commercial leases, including a sublease with sublessor Nash Finch on a supermarket in Hays, Kansas, identified as "U Save # 15."

Sixth Street failed to timely and properly exercise an option—due December 26, 1999—to renew the Hays sublease.

The Hays sublease began in 1994 as a response to the increasing competitive threat of Wal–Mart Super Centers in Sixth Street's territories. Sixth Street and Nash Finch had been doing business together for 58 years. Nash Finch agreed to sell Sixth Street three Nash Finch supermarket businesses on favorable terms, selling the fixtures, equipment, tools, and furniture at depreciated book value, selling the inventory at cost, and subleasing the stores to Sixth Street at 105% of the base rent, including the store at Hays, Kansas.[1] Sixth Street agreed to use Nash Finch as its sole food supplier for all its stores for 15 years, and agreed that Nash Finch could bid on Wal–Mart's business. Nash Finch agreed that the overall supply purchase program would be competitive, and that it would charge Sixth Street prices no higher than those of its other customers buying similar volumes. These agreements were set forth in a Retail Sales and Service Agreement (RSSA), asset purchase agreement and subleases.

Paragraph 15 of the Nash Finch sublease provides:

As conditions precedent to this Sublease, regardless of signatures being affixed on it, Sixth Street must have (i) purchased from Nash Finch the grocery store inventory, furniture, fixtures and equipment located at the Leased Premises, and (ii) entered into a Retail Sales & Service Agreement with Nash Finch.

(Def.Exh.14A).

On April 23, 1997, Sixth Street's President John Hanson sent an angry letter to Nash Finch President Al Flaten, claiming that Nash Finch had breached the pricing provisions of the RSSA. Hanson wrote:

I now have reams of evidence that Nash Finch has undertaken a massive campaign to surreptitiously, under-handedly, fraudulently and illegally build their profits by building what I have come to find out you refer to as 'inside margin' on our account.... Words alone cannot describe the feelings of betrayal and anger shared by myself and my staff.... It is clear ... that Nash has breached its agreement with us in the following respects:

1. By misstating Nash's cost prior to imposing the agreed upon markups;

2. By giving other customers, including Wal–Mart, more favorable prices than Sixth Street; and

3. By failing to give Sixth Street prices that are competitive in the marketplace.

... Absent your immediate resolution of this matter, we intend to direct our legal counsel to pursue every available legal remedy.

(Def.Exh.17).

Nash Finch denied all wrongdoing and presented explanations including financial information and other documents, which were not believed by Hanson. Nash Finch believed that Sixth Street was trying to get out of the deal due to another supplier offering an incentive package to Hanson to switch his business, and they understood Hanson wanted $3.5 million to stay with Nash Finch, which was not paid.

The parties subsequently entered into a Settlement Agreement to arbitrate Sixth Street's contract claim, and agreed to negotiate in good faith to enter into a new RSSA in 60 days. Sixth Street rejected all

---

1. The plaintiff challenges Nash Finch's characterization of the transfer as being on very favorable terms. The plaintiff provides no evidence to support the denial. The defendant's characterization is based on the deposition of John McCurry, who testified that the stores were sold "at substantially less than market value." (McCurry dep. at 57).

proposals of Nash Finch, did not enter into a new RSSA, and terminated all purchasing from Nash Finch by the end of 1998. The arbitration continues unresolved in another forum, with Sixth Street including a RICO claim in its arbitration demand. Hanson has admitted to changing circumstances between the parties with respect to the 1994 business deal.

The RICO claim greatly distressed Nash Finch officers, who believed they had done nothing wrong.

Sixth Street was one of Nash Finch's largest customers, and the failure of the 1994 deal with Sixth Street represented a loss to Nash Finch of about $70 million of business per year. The Hays store alone represented the loss of $5 million in sales annually. Although Nash Finch's profit on the 1994 deal was to be derived almost solely from the RSSA (which was a condition precedent of the subleases) and not rent the three subleases (including the Hays sublease) continued.

The Hays sublease required Sixth Street to give five months' notice to Nash Finch, due on December 6, 1999. Without Nash Finch's knowledge, Sixth Street instead gave late and incorrect notice to L & A Enterprises, the prime lease landlord in February 2000. Sixth Street was eventually alerted to its notice error by L & A, and Sixth Street attempted to give late notice to Nash Finch by telephone and then by letter on March 8, 2000. When Nash Finch did not accept, Sixth Street sought injunctive relief in the present action.

Sixth Street's Controller Chuck Mead and an administrative assistant, Nellie McCarty, were responsible for errors in its lease management procedures, which caused Sixth Street's failure to timely and correctly renew the sublease option with Nash Finch.

Before 1998, Sixth Street used computer software for property and lease management, which was used to prepare a monthly report on critical lease dates. In 1998, Sixth Street changed software and stopped using the old property management software. There is no evidence of any plan or effort to preserve the data in the old lease management software.

Likewise, there is no evidence that McCarty or anyone else checked her work on the new Excel spreadsheet against the data in the old software program. McCarty did not enter the old software data. Mead instructed McCarty to make a spreadsheet with pertinent information for each lease to show critical dates. McCarty reviewed Sixth Street's lease files to obtain critical dates.

Mead did not give McCarty any training regarding preparation of the Excel lease spreadsheet for lease management. She is a high school graduate, with no post-secondary education. Her only accounting education was a high school bookkeeping class, and she received no training in review of commercial leases.

After high school, she worked as a bookkeeper in Valentine, Nebraska, for five years, as an administrative assistant to a school principal in Sutherland, Nebraska, for about three years, as a receptionist at a doctor's office in Mullen, Nebraska, for about six years, and as a teller at a credit union for a few months in North Platte, Nebraska. She began work for Sixth Street on September 7, 1987, as a staff accountant in the accounting department, and later Administrative Assistant, although her duties remained the same.

McCarty's original duties at Sixth Street were in accounts payable and accounts receivable. In about 1994 or 1995, she was assigned to manage an apartment complex owned by Sixth Street and undertook some lease duties in that regard. She had no other real estate job experience or education, and managing the apartments did not include review of any sublease. She had no legal training or legal experience, such as paralegal, regarding review of subleases. She was never personally a party to a commercial sublease. Her only expe-

rience with reviewing leases was to prepare summary sheets of lease terms for auditors at Sixth Street. At times she reviewed subleases for that purpose, but was given no training for preparing the auditor's sheets.

McCarty prepared the Excel spreadsheet requested by Mead. It was to include all leases of Sixth Street at the time. Mead did not instruct McCarty what should be in the Excel spreadsheet columns. She decided what the columns would contain. When she prepared the spreadsheet, she used the following headings: TENANT, PRIME LEASE, EXTENSION OPTIONS, DATE EXERCISED, BASE RENT, OTHER, and CRITICAL DATE. There was no column showing subleases.

For Store 15, McCarty wrote "90 Days prior" under the heading OTHER. Under CRITICAL DATE she entered 2–1–00 to reflect that Sixth Street had 90 days to give notice before the lease would expire on May 26, 2000.

Mead, who is an accountant, did not personally review the Sixth Street lease files used to prepare the spreadsheet. Only McCarty reviewed the files. There is no evidence Mead checked her work.

When McCarty reviewed the Sixth Street file on Store Number 15, she reviewed only the prime lease and one amendment. She did not review the sublease with Nash Finch.

When McCarty reviewed the prime lease, she did not look at the first paragraph with the names Landlord and Tenant—neither of which was her employer Sixth Street—but showed "ROSS BEACH" as Landlord and "NASH FINCH COMPANY" as Tenant. (McCarty Depo., Exh. 2).

McCarty testified that when she reviewed the file to prepare the spreadsheet, she skipped over documents she felt she did not need. She did not methodically look at each document in the file to indentify what it was. Although there were three copies of the sublease in the file, McCarty does not recall seeing any of them.

The three copies of the Hays sublease are entitled, in bold capital letters, "**SUBLEASE (HAYS)**." (Def.Exh.14A). The parties to the sublease are also identified in a similar fashion:

> **THIS SUBLEASE** ("Sublease") is entered into between **NASH FINCH COMPANY**, a Delaware corporation, ("Nash Finch") and **SIXTH STREET FOODS, INC.** ("Sixth Street").

(Id.)

The sublease contains clearly marked (underlined and bold type) paragraphs indentifying Sublease Term, Options to Renew, and Notice, which contain all of the information needed to exercise the option to renew.

When McCarty prepared the spreadsheet, she not only failed to review the sublease, but also failed to review other subleases on other Sixth Street properties.

After preparing the spreadsheet for Sixth Street's leases, McCarty used it to put critical dates on her own calendar, including February 1, 2000, for Store Number 15. Before that time, she did not mark her calendar but used the old software to prepare a monthly report.

In early February 2000, McCarty prepared a lease renewal notice for Store Number 15, dated February 3, 2000, which was signed by Jay Hanson. She addressed the letter to the current Prime Lease Landlord, L & A Enterprises.

L & A was not a named party to either the prime lease or the sublease, but McCarty had recently received a letter dated October 7, 1999, informing her that L & A owned the Hays property. McCarty did not check the prime lease or sublease to ascertain who was the proper party to receive the option exercise notice.

McCarty learned there might be an error on the renewal notice when Mr. Hamm of L & A called her after receiving Sixth

Street's letter. Hamm told McCarty that Nash Finch had asked for additional time to consider its option to renew the lease, and he wondered why. McCarty told Hamm she would have Jay Hanson call. She does not recall who figured out the problem or when.

Meanwhile, when Sixth Street failed to give timely notice to exercise its option on December 26, 1999, Nash Finch promptly took steps toward converting the Hays store into a corporate store. In early January 2000, Vice President of Store Development Deborah Carlson arranged for a market study on Hays from Dakota Worldwide Corporation, and requested a Pro Forma financial analysis on the Hays location. This occurred before Nash Finch learned that Sixth Street had incorrectly given late notice to L & A.

The previous fall, a form had been circulated in the regular course of Nash Finch's lease management program alerting appropriate executives to the fact that the Hays prime lease would be up for renewal in May 2000, and requesting extension advice. Senior Vice President John McCurry had written a comment on the form that if Sixth Street did not renew the option, Nash Finch should put a corporate store in Hays or sell it to another operator.

Nash Finch prefers to minimize leasehold exposure by not renewing leases and subleases with noncustomers. At this point, Sixth Street was no longer a customer.

Around January 25, 2000, Nash Finch learned from Dakota that a new Wal–Mart Super Center grocery store would open in Hays in the fall of 2000. On February 18, Nash Finch asked L & A for additional time to exercise its option, to allow additional time for review of the Dakota study and financial analysis of a corporate store at Hays. Nash Finch paid L & A $5000 for an additional 30 days to exercise its option. At that time, Nash Finch first learned that Sixth Street had attempted to give notice of exercise of its option to L & A.

Sometime after February 18, Hanson called Carlson to discuss Sixth Street's failure to give timely notice to Nash Finch on the sublease. Carlson did not agree to accept late notice. Sixth Street gave written notice to Nash Finch attempting to exercise its option on or about March 8, 2000. The present action was filed on March 27, 2000.

In support of its claim for "unconscionable loss" Sixth Street claims that it invested about $2.8 million in the Hays store in 1996, mostly in equipment and fixtures. This figure is based on a listing of depreciated assets with current book values of $150,461.28, $746,351.33, and $133,098.01, for a current total net book value of $1,029,910.62.

Nash Finch contends that most of these improvements were additional fixtures, which can be physically removed from the store, and which under the relevant lease provision Sixth Street is *entitled* to remove from the premises at the conclusion of the lease.[2]

It relies upon Hanson's response to an interrogatory in which he indicated, referring to specified items on an attached depreciation ledger, that the "bulk of the

---

2. The prime lease states:
FIXTURES AND EQUIPMENT. All equipment, machinery, and appurtenances thereto, as well as all property of every description used by Tenant in carrying on its business, installed and placed on the premises by Lessee, is not and shall not become a part of the realty, but is and shall be considered as personal property and may be removed as such by the Tenant upon the termination of this Lease so long as such removal does not damage the premises, or if damaged, such damage is repaired by Tenant.
(Def. Exh. 2, at ¶ 12).
The sublease provides:
Nash Finch grants to Sixth Street all the rights and privileges which Nash Finch has under the Prime Lease except as modified or as otherwise provided in the Sublease.
(Def.Exh.14A).
There are no modifications or other provisions as to fixtures, equipment and machinery in the sublease.

items ... would probably constitute 'fixtures.'" (Answers to First Interrogatories, at 7). However, the interrogatory asks Hanson which "improvements are 'fixtures' that would become the property of the landlord at the end of your lease term." (Id.) Sixth Street otherwise establishes that it invested approximately $1,645,000 in capital improvements in the store from 1995 to 1997, and that these improvements are permanent in nature; they cannot be physically removed from the store. Although Nash Finch suggests there is a conflict between Hanson's answer to the interrogatory and the evidence provided in the response to its motion for summary judgment, the evidence is in fact consistent, with the clarification that, in the interrogatory, Hanson was asked about improvements which would remain with the store after the end of the sublease. The evidence therefore supports the conclusion that Sixth Street has invested a substantial amount in improving the store, an amount which it will forfeit in the event the sublease is terminated.

Nash Finch cites a provision in the sublease which provides that "Sixth Street shall not make any Changes to the Leased Premises without Nash Finch's advanced written consent, not to be unreasonably withheld." (Def. Exh. 14A, at ¶ 10). The sublease defines "changes" as "any 1) repair, alteration or improvement exceeding $25,000, or 2) addition to the Leased Premises." (Id. at ¶ 1). However, Sixth Street presents as an uncontroverted fact, undisputed by Nash Finch in its reply, that prior to the sublease, Hanson "committed to Al Flaten of Nash Finch that Sixth Street would invest larger amounts of capital into improving the Hays grocery store facility." (Plf. Resp. at ¶ 78).

The sublease states under "Options to Renew"—

Provided Sixth Street is not in default of any of the terms or conditions of this Sublease, it shall have four (4) consecutive options to renew....

(Def. Exh. 14A, at ¶ 6).

The sublease states:

None of the conditions of this Sublease shall be considered waived unless given in writing. No such waiver shall be a waiver of any past or future (i) default or (ii) breach; nor shall it be considered a modification of any of the conditions of this Sublease unless expressly stipulated in the waiver.

(Id. at ¶ 28).

The file on Store Number 15 kept by Sixth Street has no written consent from Nash Finch for changes or additions in excess of $25,000, and no written waiver.

The sublease provides: "Time is of the essence in this Sublease." (Id. at ¶ 29). The prime lease required 90 days' notice of the option to renew. The five-month notice period in the sublease allowed Nash Finch a longer period in which it could consider its own options under the prime lease if the tenant failed to renew.

Paragraph 14 of the sublease provides:

Sixth Street shall indemnify and hold harmless the Prime Landlord and Nash Finch, their officers, directors, employees and agents, from any claims, actions, expenses, fines and attorneys' fees arising or growing out of this Sublease, included but not limited to, Sixth Street's use and occupation of the Leased Premises and the operation of its business, whether or not caused or materially contributed to by any action or inaction of the Prime Landlord, Nash Finch, their officers, employees, or agents.

(Id. at ¶ 14).

Finally, the sublease provides: "A default by Sixth Street under the Retail Sales and Service Agreement entered into between the parties, shall constitute a default under this Sublease." (Id. at ¶ 22). There was no RSSA in place at the time

Sixth Street attempted to exercise its option in 2000.

The attempted untimely option notice of Sixth Street caused Nash Finch to incure the hard cost of $6400 in hiring Dakota for the Hays market study, the soft costs of Nash Finch personnel spending time on the market study and Pro Forma projects, and the hard cost of paying $5000 to L & A to gain time to consider options. James Wyvell, Manager of Financial Planning and Analysis for Nash Finch, has testified that his department does not track time spent on particular projects, such as the Pro Forma in question here. He did testify that such an analysis normally takes no more than a few hours, start to finish.

Nash Finch made no efforts to try to market the store to other potential tenants or to locate others interested in subleasing the property between December 26, 1999 and the filing of the present litigation. Finding a willing store operator for this market would be difficult and could take from six months to a year.

The normal process in deciding to make a grocery store a corporate Nash Finch store requires a market analysis survey and a Pro Forma preparation. A project budget, general review of the project, and a proposed fixture plan would also have to be generated. Nash Finch had begun none of these latter steps prior to the present litigation.

There would be no job loss in Hays if the sublease is terminated, since Nash Finch's intention is to operate the store as a corporate supermarket. Nash Finch intends to accomplish the change without closing the store for any extended period of time.

The prime lease states that when Nash Finch first leased the space it contained 26,000 square feet, and Nash Finch agreed to construct an addition. The store currently has approximately 42,114 square feet, of which Sixth Street added 1,100. Nash Finch constructed approximately 16,000 square feet.

Nash Finch's Pro Forma study of Hays was prepared by James Wyvell, Manager of Financial Planning and Analysis. Wyvell has seven years of experience in business financial analysis, and master's degrees in business taxation and in finance and strategy. The Pro Forma had the purpose of financial evaluation of a corporate store at the Hays premises, and concluded in favor of having a corporate store on the site, projecting a 15% return on investment.

Nash Finch currently makes about five cents per square foot gross profit on the Hays rent of $1.00 per square foot on square footage of 43,000 square feet, with Sixth Street paying 105% of the prime lease rent; or $2,150 per year gross profit on the Hays store. With fair market value of about $3–$4 per square foot, Nash Finch could rent the store for $129,000 to $179,000 per year, at a gross profit of $86,000 to $129,000. Nash Finch has lost this potential profit since Sixth Street ceased all purchasing in the fall of 1998, for a total loss to date of about $172,000 to $258,000.

As a result of Sixth Street's failure to give timely notice on the sublease, Sixth Street has changed its lease management procedures. Rather than relying solely on McCarty, Mead, a degreed accountant, checks all leases, along with Vice President Jay Hanson and President John Hanson.

## Conclusions of Law

■ There is no significant dispute between the parties as to the applicable law. Both sides agree that the starting point is *Fleming Companies v. Equitable Life Ins.*, 16 Kan.App.2d 77, 818 P.2d 813 (1991), which creates a high burden for a lessor who seeks to prevent a lessee from exercising a renewal option after the date specified in the lease, but within the current term of the lease. In Fleming, the Kansas Court of Appeals held that the renewal would be effective so long as the failure to properly exercise the option was not inten-

tional, or the product of willful or gross negligence.

 Nash Finch argues at length that Sixth Street's conduct amounts to gross negligence, in particular on McCarty's lack of legal training and real estate experience, but the court must conclude that defendant has failed to meet the requisite standard. What Nash Finch essentially shows is certainly a mistake or negligence; the facts do not establish that Sixth Street was reckless or wanton with respect to the renewal.

Both sides make various arguments about how this case is either closely related to, or entirely distinguishable from, Fleming. The court finds the following considerations to be of particular significance. First, Sixth Street failed to timely renew the sublease, but the failure appears to be a matter of simple negligence rather than gross negligence. Second, Sixth Street invested substantial sums in improving the property, which will be lost if the sublease is forfeited. Third, as a result of Sixth Street's failure to exercise the renewal option in a timely fashion, Nash Finch has suffered some damage in preparing contingency plans for converting the store to a corporate store. However, these plans reached only preliminary stages, and the expenses involved are far smaller than the amount Sixth Street invested in improving the property. In any event, Sixth Street has signaled that, if ordered to by the court, it will pay Nash Finch's expenses as the price of renewing the lease. Finally, the delay in exercising the option was not extensive, and was corrected by Sixth Street as soon as it learned of its mistake.

Accordingly, the court will deny defendant's motion for summary judgment (Dkt. No. 30), and grant plaintiff's motion (Dkt. No. 36), contingent upon Sixth Street's payment of Nash Finch's expenses described above.

IT IS SO ORDERED this 18th day of January, 2001.