(28 P.3d 1040)
No. 85,550

TIMOTHY D. DUFFY and CARROL A. DUFFY, *Appellants*, v. JOHN T. CASADY, *Appellee*.

Opinion filed August 3, 2001.

*John L. Richeson* and *Daniel D. Covington*, of Anderson, Byrd, Richeson, Flaherty & Henrichs, of Ottawa, for appellants.

*John C. Chappell*, of Lawrence, for appellee.

Before GREEN, P.J., KNUDSON, J., and PHILIP C. VIEUX, District Judge, assigned.

KNUDSON, J.: Timothy D. Duffy and Carrol A. Duffy brought suit again John T. Casady, alleging termination of a written lease executed on June 27, 1975, and requesting damages or rent from Casady as a holdover tenant. The gravamen of their action is that Casady failed to timely exercise an option to extend the lease, thereby allowing the lease to expire under its express terms. The district court, relying primarily upon *Fleming Companies, Inc. v. Equitable Life Ins. Co.*, 16 Kan. App. 2d 77, 818 P.2d 813 (1991), applied principles of equity and concluded the tenant's untimely exercise of the option should not cause the lease to terminate.

We conclude equitable relief is not available to Casady. The district court's decision is reversed, and the case remanded for consideration of the other issues raised at trial but not decided by the court.

At bench trial only Timothy D. Duffy and John T. Casady testified. The ground lease in issue provides the tenant with what is called a "tank farm," an integral part of Casady's oil production from six oil and gas leases. The following history of the leases and use of the tank farm is provided in the appellee's factual statement of the case:

"3. These leases have been producing since the early 1960's. [Citation omitted.] In all, there are about 80 oil wells, plus 14 injection wells. The leases are in secondary (waterflood) production, producing from the same oil reservoir. [Citations omitted.] Although these leases are not formally unitized, they are operated essentially as a unit. Oil and water produced from the leases is transported in underground lines to a 'tank farm' located on the Duffy lease. Although all the tanks are located together on the Duffy lease, there are separate tanks for each lease. [Citations omitted.]

"4. The 'tank farm,' as well as a shop building, water supply well, and other facilities used in defendant's lease operations, has been the subject of a surface lease dated June 23, 1975, covering a tract 200 feet by 400 feet (about 1.8 acres), the north line of which is on the north line of the Duffy lease. The 1975 surface lease, granted by plaintiffs' immediate predecessors in title, replaced an earlier surface lease written in 1965. [Citations omitted.]

"5. Defendant's activities on the surface lease include those directly associated with the pumping and operation of [six oil and gas leases]. The water supply well for the waterflood operation is located on the surface lease. The injection water used in the waterflood on these leases comes from water tanks which are located on the surface lease, and is pumped from the pump house and shop located on the surface lease, near the tank battery. [Citations omitted.]"

The written ground lease states, in material part:

"The term of this lease shall be FIVE YEARS, commencing July 1, 1975, through June 30, 1980, provided, however, that Lessee shall have the option to extend this lease for successive one-year terms upon payment to Lessors, in advance of each July 1 anniversary, the annual rental hereunder.

"The annual rental hereunder, both as to primary term and any renewal term, is $250.00, payable annually in advance of July 1 of each year, commencing July 1, 1975.

"The leased premises shall be used by Lessee exclusively for the installation and maintenance of crude oil gathering tanks, pipe racks, water pumping and treatment equipment, water-supply well and ponds, and oil field equipment storage.

"At the expiration of the primary term or any subsequent renewal term, it will remove all equipment placed thereon and will re-deliver the premises to Lessors in a condition for agricultural operations."

By its terms, the lease does not expressly provide for an adjustment of rent due to inflation or other circumstances. Although not clear from the evidence, we suspect the Duffys felt somewhat frustrated, as they were seemingly unable to modify the lease so long as Casady exercised the option to extend in a timely manner. This is borne out by the evidence of their unsuccessful attempts in 1985

and 1992 to terminate the lease or force negotiations for an increased lease payment. On each of those occasions, Casady elected to stand on the terms of the written lease and his unconditional right to a 1-year extension upon timely payment of $250. As Casady would discover, the old adage, "what goes around, comes around," would be given special meaning when he inadvertently failed to make the payment for extension before July 1, 1998.

On July 20, 1998, the Duffys gave Casady written notice that the ground lease was terminated and requested he vacate and restore the premises by September 1, 1998. Casady immediately remitted payment on July 22, 1998, and explained that missing the payment was an unintentional omission. On July 27, 1998, the Duffys returned Casady's check, reiterated the lease was terminated, and again requested he vacate the premises.

On or about September 2, 1998, the Duffys sent a third letter demanding Casady vacate the premises. In May 1999, Casady attempted to deliver rent checks for both 1998-99 and 1999-2000.

In July 1999, the Duffys filed this suit for a declaratory judgment that the lease had terminated upon its express terms and requested damages for trespass and lost use of the property. Casady responded, claiming his failure to pay was due to an oversight and termination of the lease would result in unconscionable monetary losses.

At trial, the Duffys' position was clear—Casady did not proffer the annual rent payment before July 1, 1998; the lease ended on June 30, 1998; Casady cannot rely upon equity to resurrect a lease that expired by its express terms.

Conversely, Casady's position was based entirely upon equitable principles. He testified his normal routine was to write down important payment dates on his desk calendar and he simply failed to do so and inadvertently forgot to make the rent payment. He further gave detailed testimony estimating damages in excess of $90,000 if he were required to vacate the premises and relocate the tank farm.

The district court concluded equitable relief should be afforded to Casady and denied the Duffys' claims. In reaching its decision, the court relied heavily upon the *Fleming* holding. We conclude

*Fleming* is distinguishable and the district court erred in its decision.

In *Fleming*, a written lease provided that lessee was to give a written notice to renew or extend at least 1 year before the lease expired. 16 Kan. App. 2d at 78. The lessee's renewal was untimely but was exercised within the current term of the lease. 16 Kan. App. 2d at 86. In its analysis, the *Fleming* court relied heavily upon two earlier cases, *Car-X Service Systems, Inc. v. Kidd-Heller*, 927 F.2d 511 (10th Cir. 1991), and the seminal case of *Fountain Co. v. Stein*, 97 Conn. 619, 118 A. 47 (1922).

In *Car-X*, the lessee's notice to extend was exercised within the current term of the lease. 927 F.2d at 516. Likewise, in *Fountain*, the lessee's belated notice to extend was exercised within the current term of the lease. 97 Conn. at 622.

In deciding *Fleming*, the court noted: "Kansas courts have not specifically addressed the application of equitable principles to a situation involving untimely renewal of a commercial lease of real property." 16 Kan. App. 2d at 83. The court then concluded: "Adoption of the *Fountain* rule, *specifically limited to the type of situation involved in the present case*, would not unduly render all lease contracts uncertain and their terms questionable." (Emphasis added.) 16 Kan. App. 2d at 89.

Also persuasive is *U Save Foods, Inc. v. Nash-Finch Co.*, 127 F. Supp. 2d 1307, 1314 (D.Kan. 2001), which holds:

"*Fleming Companies v. Equitable Life Ins. Co.*, 16 Kan. App. 2d 77, 818 P.2d 813 (1991) . . . creates a high burden for a lessor who seeks to prevent a lessee from exercising a renewal option after the date specified in the lease, *but within the current term of the lease*. In *Fleming*, the Kansas Court of Appeals held that the renewal would be effective so long as the failure to properly exercise the option was not intentional, or the product of willful or gross negligence." (Emphasis added.)

We have been unable to find any Kansas case that would extend principles of equity to extricate a lessee from failure to give notice until after the lease has expired.

Finally, we note the somewhat obvious fact that this is not a forfeiture case. As stated in *Morton v. Sutcliffe*, 175 Kan. 699, 703,

266 P.2d 734 (1954) (quoting with approval *Gasaway v. Teichgraeber*, 107 Kan. 340, 341, 191 Pac. 282 [1920]):

" 'While forfeitures are abhorred by the law, this is not strictly a forfeiture, but a mere holding of a party to the contract it has made. There was no need of delaying the payment, and the failure to remit in time was not chargeable to the plaintiffs, and the delay left the defendant in the attitude of calling on the plaintiffs to make or recognize a different contract from the one the parties had voluntarily made.' "

We conclude that under Kansas law the *Fountain* rule is limited to those situations where the untimely notice to extend or renew is given during the term of the lease. Kansas law does not permit the application of equitable principles under the facts of this case, there being no showing of fraud, mutual mistake as to content of the lease, or undue influence. See *Squires v. Woodbury*, 5 Kan. App. 2d 596, Syl. ¶ 2, 621 P.2d 443 (1980), *rev. denied*, 229 Kan. 671 (1981).

Under the facts of this case, equity could not be invoked to extend or renew a commercial lease that has already expired by its express terms.

For the sake of completeness, we next address whether there is substantial competent evidence to support the district court's findings of fact.

In *Fountain*, the court summarized its holding as follows:

"[I]n cases of wilful or gross negligence in failing to fulfil [*sic*] a condition precedent of a lease, equity will never relieve. But in case of mere neglect in fulfilling a condition precedent of a lease, which does not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." 97 Conn. at 626-27.

We have previously reviewed the evidence presented at trial. In its findings, the district court found:

1. The failure of Casady to give timely notice was not shown to be the result of intentional, willful, or grossly negligent behavior.

2. Casady will suffer a significant financial loss if the lease is terminated.

3. The Duffys have not shown any change in position suggesting prejudice if the lease is allowed to continue.

We conclude the above findings are supported by substantial competent evidence. However, because equitable principles are not applicable, we reverse the judgment of the district court and remand for further consideration of the Duffys' claims consistent with this opinion.

Reversed and remanded with directions.